545 So.2d 1053 (1989)
Tammy ACOSTA
v.
PENDLETON MEMORIAL METHODIST HOSPITAL.
No. 88-CA-2003.
Court of Appeal of Louisiana, Fourth Circuit.
April 27, 1989.
Rehearing Denied July 19, 1989.
*1054 S. Alfred Adams, Carruth, Cooper and Adams, A Law Corporation, Baton Rouge, for Pendleton Memorial Methodist Hosp. Counsel for Douglas D. Green Com'r of Insurance for the State of La., the Office of the Atty. Gen., for the State of Louisiana and the Louisiana Patient's Compensation Fund.
Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, C. William Bradley, Jr., New Orleans, Liability Appeal Counsel for defendant/appellant.
Kendall R. Moses, Kenner, Jennifer N. Willis, New Orleans, for plaintiff-appellee.
Before CIACCIO, WARD and PLOTKIN, JJ.
PLOTKIN, Judge.
The issues presented in this appeal relate to the post-verdict procedures implemented by the trial judge. They are whether the trial judge properly polled the jury and thereafter applied the correct standard for granting a judgment notwithstanding the verdict (JNOV) in reallocating fault and increasing the jury verdict from $134,500 to $332,000.
Appellants/defendants, Pendleton Memorial Methodist Hospital (Pendleton) and intervenors, the Office of the Attorney General, Commissioner of Insurance for the State of Louisiana Douglas D. Green and the Louisiana Patient's Compensation Fund, appeal a judgment and judgment notstanding the verdict in favor of plaintiff/appellee, Tammy Acosta, now Tammy Howsmon (Howsmon).

LIABILITY
Howsmon filed a tort suit against Pendleton alleging that an x-ray table broke and threw her to the floor, while she was a patient at Methodist on November 14, 1983.
Plaintiff was scheduled for a proctoscope examination in the radiology department. She was given a muscle relaxant, placed in a wheel chair and transported to the x-ray department. Hospital personnel placed her flat on the table and took a series of x-rays.
She was instructed to place her feet against a footboard at the bottom of the table, which was to be rotated from a horizontal to a vertical position, while the patient was lying flat and upright, with her weight on the footboard. While the table was in in rotation, the left side of the footboard slipped. The testimony is conflicting as to when and how far the plaintiff fell.
The plaintiff testified that she fell two or three feet onto the floor when the footboard broke and that she struck her back on the table. The x-ray technician, Ms. Julie Ann Giammanchere, testified that she installed the footboard, tested it and found no defects. She admitted that, when the table was in a vertical position, one side slipped but testified that the plaintiff's leg *1055 dropped only two to seven inches to the floor. She stated that the incident was minor and that the plaintiff did not complain of any injury and did not appear to be injured.
The jury found Pendleton strictly liable under La.C.C. art. 2317. This court recently outlined the basis for liability under La.C.C. art. 2317 in Levie v. Orleans Parish School Board, 537 So.2d 351 (La. App. 4th Cir.1988), writ denied 538 So.2d 617 (La.1989). To prove strict liability, the injured party must show, "(1) that the thing he complains of was in the care or custody of the defendant; (2) the existence of a vice or defect in the thing; and (3) that his injury was caused by the vice or defect." Id. at 352.
In this case, there is no dispute that the footboard failed when it slipped out of place while being rotated into a vertical position. The equipment was in the exclusive control of the defendant at the time of the injury. Therefore, the jury correctly concluded that there was a defect in the x-ray table which created an unreasonable risk of harm to the plaintiff, rendering the defendant, Pendleton, liable.
The jury also correctly found that defendant and its employees did not negligently cause the accident. A review of the record supports this finding.

MEDICAL HISTORY AND CAUSATION
The parties dispute the magnitude of the injuries caused by the accident. Howsmon contends that all of her back injuries, treatment and disability were caused by the November 14, 1983 accident. Pendleton claims that she had a long standing pre-existing back condition and other physical and emotional problems and that the accident caused only a minor lumbar sprain that healed in a reasonably short period of time. Further, Pendleton contends that Howsmon elected to undergo a spinal fusion, which was unnecessary and unjustified and which partially failed.
In 1983, Ms. Howsmon was a 22-year-old female, mother of two children, separated from her husband, who had custody of the children. She suffered from anxiety-depression symptoms and had three prior surgeries, excluding childbirth. On November 2, 1983, she was admitted to Pendleton for acute viral gastroenteritis and lumbar muscle spasms. During this hospitalization, she complained of severe low back pain, which she described as sharp shooting pains across her low back, like labor pains. She was discharged on November 5, 1983.
She was readmitted to Pendleton by her treating physician, Dr. Rudolph Bourgeios, a gastrointernologist, on November 11, 1983 to determine the cause of her abdominal pain, which had increased in severity. The accident occurred on November 14, 1983. She testified that she first experienced low back pain that night when the pain medication, given earlier, wore off. Dr. Bourgeios consulted other physicians to examine her lower back.
The first consultant to examine the plaintiff's lower back was Dr. Satish Karnick, a neurosurgeon and urinary surgeon, who examined her on November 16, 1983. He testified that Ms. Howsmon denied major trauma to the back or a fall on her sacrum, and that he found no evidence of neurological injury to the spine. On November 17, 1983 a CAT scan of the back was performed, which revealed a normal disc at L-5, and a slightly bulging disc at L3-4. The scan was interpreted as essentially normal.
She was next evaluated, on November 18, 1983, by Dr. Bert Bratton, a neurosurgeon. She attributed her symptoms of low back and left leg pain to the accident. He diagnosed her injuries as a lumbar sprain caused by the accident and prescribed bed rest and physical therapy.
The final consultant was Dr. George Murphy, an orthopedist, who examined her on November 20, 1983. He diagnosed her injuries as inflammatory synovitis and prescribed anti-inflammatory medication.
She was released from Pendleton on November 23, 1983, making her hospital stay five days longer than usually required for the treatment of her original abdominal complaints. The additional hospital stay *1056 was caused by her back injury. She was instructed to return for follow-up visits.
She returned to Pendleton Emergency the next day, on November 24, 1983, with injuries to her face, and contusions of her fingers, that were inflicted by her husband in a domestic dispute.
Ms. Howsmon was examined by Dr. Murphy three times after her discharge from the hospital for her lower back, on November 29, 1983, December 6, 1983, and December 23, 1983. When last seen, she was improving. She was instructed to return, but failed to do so. Dr. Murphy diagnosed her injuries as a minor low back strain caused by inflammatory synovitis. He opined that whatever happened in the emergency room could have only been a minor strain which may have aggravated the inflammatory process.
During 1984, she visited the Berman Chiropractic Clinic. No medical records were introduced to show the dates and type of treatment received. Her co-workers did verify that she went to the chiropractor on a regular basis during this period. The record is devoid of dates and types of treatment she received from the chiropractic clinic.
Her next medical examination occurred on March 25, 1985, with Dr. Bert Bratton, fifteen months after her last visit to Dr. Murphy. She complained of lower back pain and sensations in her right leg. He believed that she had a back sprain and ordered multiple tests, which were not performed because the plaintiff claimed she could not afford them. He noted an inconsistent history since her leg pains were now in her right leg rather than her left leg.
On May 13, 1985 she consulted Dr. Henry LaRocca, an orthopedist. He testified that she reported to him that her back was hurting since the accident on the x-ray table. On June 6, 1985 he admitted her to St. Charles General Hospital for diagnostic evaluation. He performed a myelogram, CATscan and an EMG test, which were all reported normal. A discogram test was abnormal, showing disc deterioration at L5-S1.
Dr. LaRocca recommended disc fusion, which the patient accepted. He operated on June 13, 1985, and discovered damage to the L5-S1 disc. He performed a bone fusion procedure at this disc space, and inserted a metal luque rod as a permanent implant. Ms. Howsmon was discharged from the hospital June 19, 1985. Unfortunately, the fusion failed, because the metal rod did not hold the spine immobile.
Dr. LaRocca opined that Ms. Howsmon now has a 30% anatomical disability rating. He stated that the arthritic conditions of her joints were not caused by the trauma but resulted because the joint couldn't function anymore. He believed that her disc damage occurred when she fell on her back on the x-ray machine.
The defense called Dr. Monroe LaBorde, an orthopedist, to refute Dr. LaRocca's testimony. Dr. La Borde testified that he would not have performed the surgery on Ms. Howsmon. In his opinion, after receiving the hospital records and test results, there was insufficient evidence to justify spinal surgery. He testified that, applying a national standard, Dr. LaRocca should not have operated on the patient. On cross-examination, he did admit that he never personally examined the patient nor had he seen the 1985 test results taken at St. Charles General Hospital.
The final medical witness was Dr. Fred Davis, Ph.D., a psychologist who examined the plaintiff in January, 1987, in anticipation of trial. He testified that he found Howsmon suffering from a moderate depression resulting from her pain. On cross-examination, he admitted that the hospital records before the accident indicated that she suffered from anxiety-depression symptoms and that her depression could also be caused by a custody battle she was undergoing at the time. He stated that Dr. LaRocca's medical notes indicated that her emotional problems were unrelated to the Pendleton accident.

POST EVIDENCE EVENTS
After a three-day jury trial, the parties agreed upon the following special jury interrogatory *1057 form to be submitted to the jury.

SPECIAL JURY INTERROGATORIES
1. Was the x-ray table at Pendleton Memorial Methodist defective, [sic] that is, did it present an unreasonable risk of harm in ordinary use?
YES ____ NO ____
2. Was any employee of Pendleton Memorial Methodist Hospital negligent in the maintenance, servicing or operation of the x-ray table on the date of this incident, November 14, 1983?
YES ____ NO ____
(If you answered yes to either interrogatory 1 or 2, or both, proceed to interrogatory 3. If you answered no to both interrogatories, the plaintiff cannot recover. Proceed no further and return to the court with your verdict.)
3. Were Tammy Acosta Howsmon's injuries caused by the failure of the footboard on the x-ray table?
YES ____ NO ____
(If you answered yes to interrogatory 3, proceed to answer interrogatory 4. If you answered no to this interrogatory, the plaintiff cannot recover. Proceed no further and return to the court with your verdict.)
4. Did the negligence of any other persons or causes contribute to the injuries alleged to have been suffered by plaintiff?
YES ____ NO ____
5. Please state the relative percentages of negligence of all persons who you find to be responsible for plaintiff's injuries. (Note: Your figures must add up to 100%.)
(a) Employees of Methodist Hospital _______%
(b) Other persons or causes _______%
 TOTAL _______%
What amount do you find will justly and adequately compensate Tammy Acosta Howsmon for the loss which she has sustained in each of the following categories (in dollars)?
(a) Past medical expenses $______
(b) Future medical expenses $______
(c) Past lost wages $______
(d) Future lost wages and loss of
 earning potential $______
(e) Past physical pain and suffering $______
(f) Future physical pain and suffering $______
(g) Past mental pain and suffering,
 anguish and distress $______
(h) Future mental pain and suffering
 anguish and distress $______
(i) Permanent disability and loss
 of quality of life $______
 TOTAL $______
Before the verdict was rendered, the jury returned to the courtroom, indicating a question about the interpretation of interrogatory # 4 and # 5. The court clarified the language in the interrogatory to make it clear that the person or causes referred to in question # 4 would be the same as the person or causes referred to in # 5(b). The foreperson further asked the judge whether it was necessary to identify or particularize if other persons or causes were found. The judge instructed the jury that it was unnecessary to identify other persons or causes. All that was necessary to answer interrogatory # 5(b) was to determine the percentage of fault of the other persons or causes.
Thereafter, the jury initially returned a verdict, finding that Pendleton hospital's x-ray table was defective, that it created an unreasonable risk of harm and caused plaintiff's injuries under the strict liability claim, and that it was 55% responsible for plaintiff's injuries. The jury also found Pendleton not negligent. The jury further concluded that 45% of plaintiff's injuries were caused by negligent non-parties or other causes.
After the verdict was read, the court, sue sponte, inquired whether the parties desired juror polling. The plaintiff requested polling of the jury, specifically on the issue "as to the other person or causes believed to be responsible for 45% of plaintiff's injuries." The vote was 10-2 on this interrogatory. The trial court conducted an examination of each juror in open court, asking what they personally identified during the deliberations as the other causes of plaintiff's injuries in the answer to interrogatory # 5(b).
*1058 Juror responses were mixed as to the "other causes" of plaintiff's injuries. Some identified specific non-party causes such as medical treatment, others identified plaintiff's pre-existing condition, some were non-specific and a few named General Electric, the manufacturer of the x-ray table. The court was dissatisfied with the jury's responses and ordered further deliberations. The judge re-instructed the jury to combine General Electric's negligence, if any, to Pendleton in its answer to interrogatory # 5(a). All other responsibility for non-party negligence or plaintiff's pre-existing condition would be combined in the answer to interrogatory # 5(b). The plaintiff thereafter moved for a mistrial on the grounds that the jury failed to specify the non-party fault or cause. The mistrial was denied.
The jury redeliberated and returned an amended verdict, it assessed Pendleton 60% of the fault and 40% of plaintiff's injuries to other causes or non-party conduct. The jury was again polled. The judge questioned only the ten jurors, "I'll ask each one of you with reference to No. 5 how you attribute negligence and what person or causes you included in 5(B)." They indicated that Dr. LaRoca's medical treatment or plaintiff's pre-existing condition contributed to or caused her injuries. Next, only those ten jurors were re-polled to determine whether the amounts awarded were the full amounts that the jury intended the plaintiff to receive, without deduction for comparative causation. Many of the jurors did not understand the question because no law charge had been given on that issue. However, they indicated that it was their intent that the plaintiff receive $134,500.
On December 16, 1987, the district court converted the jury verdict to a Judgment of the Court in the sum of $134,500 reduced it by 40% for the portion of plaintiff's injuries caused by other persons or other causes, to a total of $80,700, with interest and costs from the date of judicial demand, subject to the $100,000 limitation of liability provided by La.R.S. 40:1299.42(B)(2). The judgment provided that any amount in excess of $100,000 should be assessed against the Louisiana Patient's Compensation Fund.
On December 23, 1987, the plaintiff filed a motion for a JNOV or, alternatively, for a new trial and additur. She argued that the verdict was contrary to the law and evidence because the jury erred by inadequately calculating the damages, they were confused about the law charge relating to other persons or causes of injury in its answer to interrogatory # 5, and the 40% reduction was improper.
On March 10, 1988, the district court granted the JNOV, holding Pendleton liable for the full amount of the $134,500 in damages awarded by the jury. It further indicated that the amounts for pain and suffering and loss of future earning potential were inadequate, and that it would grant additur or a new trial on that issue.
The defendant moved for a new trial on the grounds that the March 10, 1988 judgment failed to define the amount of additur. On March 28, 1988, the court increased the award from $134,500 to $332,000, an additur of 197,500, itemized as follows:

 JURY JUDGE
(a) Past medical expenses $ 22,000 $ 22,000
(b) Future medical expenses $ 20,000 $ 20,000
(c) Past lost wages $ 40,000 $ 40,000
(d) Future lost wages and loss
 of earning potential $ 20,000 $ 75,000
(e) Past physical pain and suffering $ 5,000 $175,000
(f) Future physical pain and suffering (total
 $ 5,000 for
(g) Past mental pain and suffering, general
 anguish and distress $ 2,500 damages)
(h) Future mental pain and suffering
 anguish and distress $ 0_____
(i) Permanent disability and
 loss of quality of life $ 20,000
 TOTAL $134,500 $332,000

POLLING THE JURY
The District Court erred procedurally in the manner in which it polled the jury. There is no statutory or codal authority in Louisiana providing for jury polls in civil cases. Polling is authorized in criminal cases when requested by the parties. La.C.Cr.P. art. 812. The right has been recognized in civil cases jurisprudentially. McCarter v. Liberty Mutual Ins. Co., 436 So.2d 726 (La.App. 4th Cir.), writ denied 440 So.2d 145 (La.1983); Turner v. Safeco *1059 Ins. Co. of America, 472 So.2d 43 (La.App. 1st Cir.1985).
Polling of the jury is the process whereby the trial judge asks each juror after the verdict is announced whether it is his or her verdict. The purpose is to determine that all jurors voted and whether a sufficient number voted in favor of a verdict as required by law. In a civil case, nine of twelve or five of six jurors must vote for a verdict in order for it to be legal. La.C. C.P. art. 1797. If the polling reveals that the number of votes is insufficient to sustain a verdict, the judge may, in his discretion, order the jury to redeliberate, declare a mistrial or grant a new trial. McCarter v. Liberty Mutual Ins. Co., supra.
Polling of the jury can only be requested by one of the parties. If the parties fail to exercise that right, it is waived. It is improper for the court, on its own motion, to poll the jury.
The correct procedure for oral polling of a jury is for the judge or clerk to call each juror, one at a time, announce to the juror the verdict returned and ask the juror, "Is this your verdict?" The juror can only respond "Yes" or "No" to each interrogatory. The same procedure should be employed when the jury is polled in writing.
LCE art. 606(B) now controls the issue of inquiry into the validity of the verdict and provides as follows:
Art. 606 Disqualification of juror as witness
B. Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
The purpose of the first part of the rule is to protect and seclude from public disclosure how and why the jury reaches a verdict. It prohibits any publication of the juror arguments, statements, discussions, mental and emotional reactions, mental processes, preliminary votes and explanations, clarifications or statements which form the reason or comprehension of the verdict. In sum, it prevents any inquiry into the internal deliberations of the jury.
Although well-intentioned, the manner of polling the jurors, in this case was improper. The procedure invaded the internal deliberations of the jury by forcing the jurors to publicly disclose the fact basis for liability rather than their conclusions on liability. The court's questions were irrelevant to the determination of whether a sufficient number of jurors agreed on a valid verdict. Finally the questions and answers caused confusion and misunderstanding about the verdict, which was the apparent basis for the filing and granting of the JNOV.

JUDGMENT NOTWITHSTANDING THE VERDICT
The district court granted plaintiff's motion for a JNOV. First, it cast Pendleton 100% responsible for the verdict rather than 60% as determined by the jury and, secondly, increased the jury award of $134,500 to 332,000.
The standard for granting a JNOV is the same used to determine whether a directed verdict should be granted. The standard of proof for deciding a JNOV requires that the trial court consider all evidence and reasonable inferences in the light most favorable to the party opposed to the motion and if facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes reasonable persons could not arrive at a contrary verdict, the motion should be granted. Blum v. New Orleans Public Service Inc., 469 So.2d 1117 (La. *1060 App. 4th Cir.), writ denied 472 So.2d 921 (La.1985). In deciding whether to grant a JNOV, the court cannot weigh evidence, pass on credibility of witnesses, or substitute its judgment for that of the jury. Rougeau v. Commercial Union Ins. Co., 432 So.2d 1162 (La.App. 3rd Cir.), writ denied 437 So.2d 1149 (La.1983), overruled on other grounds, Burleigh v. State Farm Ins., 469 So.2d 270 (La.App. 3rd Cir.1985). This standard was further clarified in Alumbaugh v. Montgomery Ward & Co., Inc., 492 So.2d 545 (La.App. 3rd Cir.), writ denied 495 So.2d 304 (La.1986), when the court stated:
We understand the standard as set out in Rougeau to mean that a motion for a judgment notwithstanding the verdict can only be granted by the district judge when, without weighing the credibility of the evidence or the witnesses, there can be but one reasonable conclusion as to the correct and proper judgment. Where there is such evidence upon which reasonable men might render a verdict in favor of the non-moving party, or where there is conflicting evidence, a judgment notwithstanding the verdict should not be granted.
Id. at 548.
The first issue is the mechanics of apportionment of fault of all parties contributing to plaintiff's harm, whether parties or not.
In 1983, Louisiana adopted the principle of comparative negligence. In order to implement this policy it amended the civil procedure articles. In cases to recover for injury, death or loss, the court must submit to the jury special written interrogatories, called a special verdict form. La.C.C.Pr. art. 1812. The purpose of the special verdict form is to require the jury to specifically determine facts at issue in the case. Thereafter, the court may enter an appropriate judgment in conformity to the jury's answers.
In an action to recover damages, the special verdict quantifies any contributory fault of the plaintiff, as well as other parties and non-parties, including causation. Therefore, in comparing fault, all of the fault proximately relating to the accident must be considered, as provided by La.C. C.Pr. 1812(C).
The trial court, attempting to comply with La.C.C.Pr. art. 1812, submitted interrogatories # 4 and # 5(b), which required the jury to determine and rate the negligence of "any other persons or causes (which) contribute(d) to the injuries." The defendant argued and the court asked the jury to decide, in answering the interrogatories, whether the plaintiff's alleged unnecessary, unwarranted and unsuccessful treatment and her pre-existing condition were causes of the plaintiff's injuries.
Howsmon contends, incorrectly, that the 40 percent finding of other causes of injury is defective because of the polling of the jury, ten jurors failing to reach a consensus as to the causes responsible for 40 percent of the plaintiff's injuries. Although the polling procedure was improper, the jury voted ten to two on two occasions that other persons or causes contributed to plaintiff's injuries.
We conclude that the jury was confused and erred in their answers to interrogatory # 4 and # 5(b). The interrogatories relate to fault questions of fact. The jury charges and the jury answers allude to the issue of medical causation, not fault. The record is unambiguous that both the judge and the jury requested evaluation and rating of the degree of plaintiff's pre-existing condition and the alleged unnecessary surgery. Neither of these issues pertain to comparative fault. Therefore, this jury response was manifestly erroneous.
The original judgment reduced the verdict by 40 percent. However, the trial court properly corrected its error when it entered a JNOV, which eliminated the 40 percent reduction and cast Pendleton liable for 100 percent fault, which we now affirm.
The second JNOV issue is additur. The primary function of the jury is the determination of questions of fact upon which reasonable persons might differ. The administration of rules of law and the determination of facts upon which there could be no reasonable difference of opinion *1061 is the function of the court. It is well settled that the amounts awarded by the jury will not be altered by the trial judge or appellate courts absent an abuse of discretion by the jury.
The standard for reviewing a damage award was stated in Carlin v. Blanchard, 537 So.2d 303 (La.App. 1st Cir.1988).
A jury is given much discretion in fixing the amount of damages due. This determination will not be disturbed on appeal unless the jury clearly abused its much discretion. The question presented upon appellate review is not whether a different amount might have been more appropriate, but whether the amount awarded by the jury can reasonably be supported by the evidence and justifiable inferences from the evidence.
Id. at 309.
When a trial court grants a JNOV on the issue of damages, the appellate court must examine the record to determine whether the trial court's conclusions on quantum are manifestly erroneous and should not disturb the quantum unless the trial court abused its discretion. Roger v. Cancienne, 538 So.2d 670 (La.App. 4th Cir.1989).
The district court, without reasons, altered the quantum on two elements. General damages were increased from 32,500 to 175,000. Future lost wages and loss of earning potential was raised from $20,000 to $75,000.
The district court confected the quantum interrogatories into 9 categories. Sections A-D of Interrogatory 6 relate to out-of-pocket expenses, called specials. Sections E-I relate to general damages.
Scrutiny of the answers to Sections E-I unequivocally demonstrate that the jury intended to award relatively minor damages to the plaintiff for the November 14, 1983 accident. The jury awarded $10,000 only for past and future physical pain and suffering and $2500 for past and future mental pain and suffering, anguish and distress. In the latter section they award her nothing for future mental suffering. Clearly, the jury found the past and future physical mental pain inconsequential in relation to her claim for a ruptured disc. The $20,000 award for permanent disability and loss of quality of life is harmonious with this conclusion.
However, it was inconsistent to some degree, but not manifest error, to award her $20,000 future medical expenses. This award does not imply that the jury found Howsmon sustained a ruptured disc injury. It represents the uniform intent of the jury to reimburse her for all past and possible future medical expenses. Based on the wording of the law charges in this case, the jury could have related this future medical expense to the November 14, 1983 accident.
We hold that there was sufficient credible evidence to support the jury's conclusion and inferences that Howsmon did not sustain a ruptured disc requiring surgery but suffered a lumbar sprain and a minor aggravation of her pre-existing condition. We find that the general damages determined by the jury in the sum of $32,500 to be within their discretion and that the district court abused its discretion in increasing that amount. The general damage award is reduced to $32,500.
The district court, without reasons, increased from $20,000 to $75,000 the award for future lost wages and loss of earning potential. The standard for loss of earnings and earning capacity is as follows:
Awards for loss of future income are inherently speculative and insusceptible of being calculated with mathematical certainty. The court must exercise sound judicial discretion in reviewing these awards and render a decision which is consistent with the record and does not work an injustice on either party. Smith v. Porche Brothers Lumber and Supply, Inc., 491 So.2d 412 (La.App. 1st Cir. 1986). The standard to be applied requires damages for loss of earnings to be based on the injured person's ability to earn money rather than what he actually earned prior to the injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Loss of future income awards thus encompasses the loss of a plaintiff's earning potential. Loss of earning potential is the loss or reduction of his capability to do that for which he is equipped by nature, training, *1062 and experience and for which he may receive recompense. Wisner v. Illinois Central Gulf R.R., 537 So.2d 740 (La. App. 1st Cir.1988)
Howsman claimed that as a cumulative result of her injuries she experienced a diminution in her ability to work. She no longer is able to sit for long periods of time and perform clerical functions. The only testimony on the wage issue was given by Dr. M. Wolfson, who stated that past lost wages were $33,125 (the jury awarded $40,000)[1] and that future wage losses were at maximum $308,569 or at minimum $289,000, discounting the total using minimum wages as a base. The jury awarded only $20,000 in future wage loss. Again this is congruous with the jury's opinion that the plaintiff's injury was a lumbar sprain rather than a ruptured disc.
It is apparent that the jury did not abuse its discretion in making this award. On the other hand, there is no reasonable basis in the record, based on the evidence and the trial court's failure to provide reasons for judgment, to determine how or why the trial judge selected the sum of $75,000 to award to the plaintiff. Given these circumstances, we defer to the discretion of the jury, rather than the trial judge, in deciding this issue. The District Court abused its discretion in increasing the future wage loss. We reduce it to the original sum of $20,000.
Accordingly, we affirm the JNOV holding Pendleton liable to the plaintiff. We reverse the JNOV on damages and reinstate the jury verdict in the sum of $134,500, plus interest from the date of judicial demand. All costs are assessed against the defendants.
AFFIRMED IN PART REVERSED IN PART.

ON APPLICATION FOR REHEARING
PER CURIAM.
Appellant requests a rehearing, contending that an incorrect standard of review was applied on appeal. We reject this argument and deny the application for rehearing.
After post-trial motions were filed by the plaintiff, the original jury verdict was reformed by the trial judge. At trial the jury awarded the plaintiff $134,500 and found that the defendant was liable for 60 percent of that amount. The trial court granted plaintiff's Motion for a Judgment Notwithstanding the Verdict (JNOV) and held that the defendant was liable for 100 percent of the judgment. The trial court also granted an additur, increasing the jury award to $332,000.
The standard for review of a JNOV on issues of liability or damages requires this court to examine the record to determine whether the trial court's conclusions are manifestly erroneous. Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.), writ denied, 476 So.2d 353 (1985). When a trial court grants a JNOV on the issue of damages, the appeals court should not disturb the quantum unless the trial judge abused his discretion. Roger v. Cancienne, 538 So.2d 670 (La.App. 4th Cir.1989).
When the quantum of a judgment reformed by additur is reviewed, the appellate court is limited to review of the reformed judgment and, absent clear errors in the findings of fact or abuse of discretion, the reformed judgment should be affirmed. Karl v. Amoco Production Co., 507 So.2d 263 (La.App. 3rd Cir.1987).
This court reviewed the record and found that the JNOV holding the defendant 100 percent liable was a correct ruling of law. After reviewing the trial court's additur, this court found that the reformed quantum was an abuse of discretion and reinstated the jury's verdict for the reasons expressed in our opinion.
For the above and foregoing reasons, the application for rehearing is denied.
NOTES
[1] Dr. Wolfson calculated a loss in actual wages of $33,125. To this figure he added a $300 a month cash car allowance that amounted to an approximate figure of $6,444. The total for lost wages came to $39,569.