563 So.2d 1218 (1990)
Randolph C. LEJEUNE, III and Rebecca Lejeune
v.
William D. COOK and State Farm Mutual Automobile Insurance Company.
No. 89 CA 0600.
Court of Appeal of Louisiana, First Circuit.
June 26, 1990.
*1219 Sumpter B. Davis, III, Baton Rouge, for Randolph C. Lejeune, III and Rebecca Lejeune.
Carey Guglielmo, Baton Rouge, for William D. Cook and State Farm Mut. Auto Ins.
Before COVINGTON, C.J., and WATKINS and DOHERTY, JJ.
DOHERTY, Judge.[*]
Randolph C. Lejeune, III and Rebecca Lejeune (plaintiffs) brought suit against William D. Cook and State Farm Mutual Automobile Insurance Company (defendants) for damages resulting from an automobile accident in which Randolph Lejeune's 1986 Nissan pickup truck was rear-ended by a vehicle being driven by defendant Cook's minor daughter. Randolph Lejeune was alone in the vehicle when the accident occurred on October 9, 1986. When his vehicle was struck, it was pushed thirty or forty feet down the road; his head hit the rear window of the truck and knocked the window loose. Major property damage was sustained to the truck. Randolph's shoulders, neck, head, and jaw were sore, and from the time of the accident he experienced headaches daily and a ringing in his ears perhaps once a week. He was eventually treated for temporomandibular joint syndrome (TMJ). It is this injury for which Randolph Lejeune sought damages; his wife, Rebecca, sought damages for loss of consortium.
In written reasons for judgment, the trial court found as fact that the accident was the sole fault of State Farm's insured; that Randolph suffered from TMJ syndrome directly resulting from the accident; and that policy limits of 100,000/300,000 were applicable to the accident. The judgment awarded $3,600.00 in past, present and future medical expenses, and $12,500.00 in general damages to Randolph Lejeune, and gave no award to Rebecca Lejeune for loss of consortium. Plaintiffs have appealed, assigning as error the following:
(1) that the trial court erred in not awarding past and future medical expenses in the sum of $16,350.00;
(2) that the trial court's award of $12,500 in general damages to Randolph Lejeune was grossly inadequate;
(3) that the trial court's failure to award damages for loss of consortium to Rebecca Lejeune was in error.

ASSIGNMENT OF ERROR # 1
The crux of this assignment of error is the vast discrepancy between the testimony of Dr. Roger E. Peak, Randolph's treating dentist, and Dr. Robert D. Westerman, a dentist retained by State Farm for evaluation purposes who saw Randolph on two occasions. Dr. Peak testified that, in addition to the $2,100 he charged up to the time of trial for splint therapy and a panograph, work in the amount of $14,250 would be necessary to properly treat Randolph's TMJ syndrome. On the other hand, Dr. Westerman's assessment both of the treatment needed and its cost were radically different from that of Dr. Peak. Although Dr. Westerman agreed with Dr. Peak's treatment up to the date of trial, his *1220 plans for future treatment would involve necroabrasion, or grinding down of some of the teeth, rather than gnathological crowns as recommended by Dr. Peak; the total cost for treatment estimated by Dr. Westerman would be $850.00.
Randolph Lejeune testified that he began having headaches immediately after the accident of October 9, 1986 and he took some aspirin and went to bed. He worked the Monday following the Friday accident. His headaches continued and on November 7, 1986,[1] he went to see his family dentist, Dr. William Tuttle. Dr. Tuttle testified that he did not recall Randolph mentioning an automobile accident at that time, although there was a note on his chart of TMJ problems; the note was in his receptionist's handwriting. Randolph testified that since Dr. Tuttle was not helping him, he sought other medical advice and was eventually referred to Dr. Roger Peak. He saw Dr. Peak first on June 3, 1987.
Dr. Roger Peak is a general dentist with special training in TMJ treatment. Although TMJ syndrome is not a recognized specialty in dentistry, Dr. Peak testified that at least fifty percent of his practice was of TMJ patients, and he has focused on TMJ treatment since 1978. Dr. Peak testified that TMJ is not a dental but a medical problem. The mechanism of the temporomandibular joint is a combination of the head of the condyle and the meniscus. The condyle is the ball and socket joint at the upper end of the lower jaw. When the tendons which hold together the meniscus (a tissue between the head of the condyle and the skull) are torn or dislocated, the meniscus changes its position, and the head of the condyle is likewise displaced. This displacement changes, in turn, the way that the tops of the teeth meet.
Dr. Peak testified that Randolph had typical symptoms of TMJ, including recurring headaches, cervical pain, clicking joint, visual disturbances, and pain on palpitation of the TM joint. He believed that the syndrome was caused by the accident because the symptoms started immediately after the accident.
Dr. Peak's initial treatment was the contraction and insertion of a plastic splint into Randolph's mouth, which was designed both to eliminate the symptoms and to serve as a diagnostic tool to indicate placement of the jaw for the final treatment. By October 5, 1987, Randolph was symptom-free. The controversy arises with the proposed subsequent treatment: Dr. Peak planned to totally rebuild Randolph's teeth by creating nineteen special crowns which would result in a perfect bite and which would give him "some degree of permanency in his comfort." Without this additional work, Dr. Peak testified Randolph's symptoms would return with even greater intensity.
Dr. Robert Westerman, a dentist who practices both general dentistry and who sees from three to five patients a day with TMJ problems, testified that State Farm referred Randolph to him and he saw him twice, first on April 25, 1988 and subsequently on July 20, 1988. When Dr. Westerman first saw Randolph, Randolph had considerable dental problems, including an abscessed tooth, numerous cavities, nine missing teeth, and gum problems. However, Dr. Westerman testified that he believed from the history Randolph gave him, the TMJ syndrome was related to the accident.
On April 25, Randolph was having difficulty opening his jaw normally, and there was a great deal of noise in the joint; an MRI was ordered, which indicated no abnormalities whatsoever. Dr. Westerman was surprised at the results of the MRI, but when he saw Randolph again on July 20, his examination was consistent with the MRI.
Dr. Westerman testified that he would have treated the TMJ problems initially by inserting a splint, for which he would have charged $600, plus $150 in X-rays. He *1221 would then perform necroabrasion to correct the bite and resolve the TMJ problems, for which he would have charged $100. He would gradually wean the patient off the splint, so that ultimately he would be wearing it for less and less time; however, it would probably be necessary to wear it at night. He did not believe further orthodontic work such as Dr. Peak recommended would be necessary to correct the TMJ problem.
The trial judge summarized Dr. Westerman's testimony as follows: "In other words, instead of putting on nineteen crowns, you're going to grind the four teeth that would allow the other nineteen to meet?" Dr. Westerman answered, "That's correct."
The trial court apparently believed that Dr. Westerman's proposed treatment was more feasible than the more elaborate, and considerably more costly, proposed treatment by Dr. Peak. Plaintiff argues that the court's statement in written reasons for judgment that his "mouth was in a very poor condition prior to the time of this accident" indicates that the court was concerned about a possible windfall to Randolph if the full $16,350.00 recommended by Dr. Peak for TMJ repairs were to be awarded. However, it awarded for past, present and future medical expenses $3,600.00, or $1,500.00 more than the actual medical expenses sustained up to trial by Randolph and almost three times the total cost Dr. Westerman estimated would be required to repair Randolph's TMJ syndrome. We do not find that the trial court's favoring Dr. Westerman's testimony over that of Dr. Peak was clearly wrong. Nor do we find that the amount of the award was an abuse of discretion. Rosell v. ESCO, 549 So.2d 840 (La.1989).

ASSIGNMENT OF ERROR # 2
In awarding $12,500.00 for general damages to Randolph Lejeune, the trial court stated "... considering ... that plaintiff did not seek treatment until some three months after this accident, has never been hospitalized, has not missed any work, has not required any medication other than aspirin and B.C. powder, and his mouth was in a very poor condition prior to the time of this accident ... $12,500.00 will justly and fairly compensate him for the damages he suffered as a result of this accident." Plaintiffs argue that this award should be increased because Randolph should not be penalized for his ability to bear the pain of the headaches he experienced as a result of the accident; further, they argue that the fact that Randolph's teeth were in bad shape is irrelevant to the treatment of his TMJ syndrome, which is focused only incidentally on routine dental work and orthodontic correction.
Randolph Lejeune testified that for one year, from October 9, 1986 until October 5, 1987, he experienced headaches which were "pretty severe at times." He testified that he did not seek treatment for three months because "I just thought it would eventually go away by itself." During those three months, he had headaches three or four times a week. After Dr. Peak inserted the splint in Randolph's mouth in June of 1987, the headaches began subsiding within two to three weeks. Randolph still occasionally gets headaches if he fails to go back in to have the splint realigned. Before he saw Dr. Peak, he would begin taking aspirin in the morning on the job and continue during the day; at night, he would go to bed early rather than taking more aspirin. During that period, he became withdrawn from his family; he avoided his wife and two children as much as possible because "they would get on my nerves pretty quick." Because he was going to bed earlier than usual, his and Rebecca's sex life suffered somewhat. Randolph testified that he was anxious about his condition before Dr. Peak's diagnosis; he "waited it out as long as he could."
Although we sympathize with plaintiffs' argument that they should not be penalized because Randolph sought treatment three months after the accident and medicated himself with aspirin only, we do not find that the record indicates any abuse of discretion on the part of the trial court in awarding $12,500.00 for general damages. Plaintiffs cite several cases as support for *1222 their argument that quantum should be increased in this case. However, we have no difficulty in distinguishing these cases because in each of them, the injury was considerably more severe than that in the case before us.
In Friedrichs v. State Farm Fire & Casualty Insurance Company, 496 So.2d 496 (La.App. 1st Cir.1986), the trial court awarded $25,000 for future pain and suffering to a young woman in her early 20's who according to the expert testimony, could suffer pain from TMJ intermittently the rest of her life; the judgment awarded $5,000 for past pain and suffering. No testimony was offered in this case concerning future pain; in fact, plaintiff's own doctor testified that he was completely symptom-free as of October of 1987, although he believed the symptoms could recur with more intensity if his proposed treatment were not carried out.
In Clement v. State of Louisiana through the Department of Transportation and Development, 528 So.2d 176 (La. App. 1st Cir.), writ denied 532 So.2d 157 (La.1988), a plaintiff who fractured her jawbone, was unable to use her teeth for ninety days, underwent six root canals, and suffered a cervical strain, together with having TMJ dysfunction, was awarded $68,000 in total damages. This case is clearly distinguishable; Randolph's only complaint was headaches, which were essentially resolved by the end of June, 1987, after the splint was inserted, and which were completely resolved by October of 1987.
In Hardin v. Munchies Food Store, 521 So.2d 1200 (La.App. 2d Cir.), writ denied 523 So.2d 1321 (La.1988), a plaintiff who watched her boyfriend being brutally beaten and, in trying to escape herself, hit her jaw on the rearview mirror of her vehicle and screamed constantly throughout the ordeal, was awarded $20,000 in general damages. She had undergone corrective surgery for an aggravation of preexisting TMJ syndrome, which surgery failed; she later underwent surgical removal of the splint; she further suffered post traumatic stress disorder as a result of the incident.
These three cases can be readily distinguished from the case at hand, and further, our independent research reveals that awards for TMJ dysfunction range from $18,000 to a minor who underwent teeth implant procedures and whose mouth was wired for two months, Bock v. Burnham, 419 So.2d 6 (La.App. 4th Cir.1982), to $50,000 for a woman who underwent treatment for TMJ problems for three years, including numerous surgeries, and who was described by her dentist as an "oral cripple." Fonseca v. Hall, 555 So.2d 42 (La.App. 1st Cir.1989). Considering the testimony that by July of 1988, an MRI indicated absolutely no problems with Randolph's jaw, and that Randolph himself testified that his headaches resolved within two to three weeks after the splint was inserted, we cannot believe that the award of $12,500.00 in general damages was an abuse of the trial court's discretion under the standards of Reck v. Stevens, 373 So.2d 498 (La.1979).

ASSIGNMENT OF ERROR # 3
Plaintiffs' complaint in this assignment of error is that the trial court erred in failing to award any damages to Rebecca Lejeune for loss of consortium. The trial court, in its reasons for judgment, cited two cases: Johnmeyer v. Creel, 499 So.2d 571 (La.App. 2d Cir.1986) and Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985) in support of its holding that Rebecca Lejeune failed to prove by a preponderance of the evidence that she suffered any loss of consortium, service and/or society as a result of the accident.
Johnmeyer`s facts were similar to the instant case. Mrs. Johnmeyer testified that as a result of her husband's accident, her relationship with him was stressful; her husband was worried, cross and hurt, and she was concerned about the financial impact of the accident on the family. There was no further evidence offered. Here, Rebecca Lejeune testified that her husband withdrew from the family, went to bed early, wouldn't talk to her and her daughters and was moody. She thought "something was wrong between us" until he started seeing Dr. Peak and was diagnosed *1223 as having TMJ syndrome. Their sexual relationship was "a little stressful ... and he did go to bed quite a bit earlier when he had a headache." However, on cross she testified that they had had no sexual problems since the accident. There was no further testimony.
In Finley, various elements of a consortium claim were analyzed, and the court held that the plaintiff there only proved conclusively that sexual relations suffered; thus the award of $5000 was affirmed. Concerning "loss of felicity," the opinion stated, "We think that every personal injury tends to decrease the parties' overall happiness but Mrs. Finley has not shown any particular losses distinct from the other elements enumerated."
We agree with the trial court here that Rebecca Lejeune failed to prove by a preponderance of the evidence that she suffered any loss of consortium. Plaintiffs attempt to argue that the recent Supreme Court case of Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990), which recognized a cause of action for mental pain and anguish suffered by a third person, is applicable here because previous cases (including Johnmeyer) which discussed loss of consortium, distinguished between consortium claims as recoverable, and mental pain and anguish claims suffered by a third person as non-recoverable. We do not find that Lejeune has any bearing here. Lejeune very carefully delineated the circumstances under which a mental anguish claim occasioned by negligent infliction of injury to a third person could be asserted, and noted that a consortium claim was limited to a specific class of persons under Civil Code art. 2315.2, which did not directly address mental pain and anguish claims. Lejeune v. Rayne Branch Hospital, 556 So.2d at 570, n. 12. The proof offered here was insufficient to establish a loss of consortium claim; if anything, the standard of proof required under Lejeune for a claim for mental anguish occasioned by negligent infliction of injury to a third person is even higher.
The judgment of the trial court is AFFIRMED. All costs are to be assessed to plaintiffs.
AFFIRMED.
NOTES
[*] Judge Lewis S. Doherty, III, retired, is serving as judge pro tem by special appointment of the Louisiana Supreme Court to fill the vacancy created by the temporary appointment of Judge Melvin A. Shortess to the Supreme Court.
[1] Randolph Lejeune, III testified that he did not seek treatment until three months after the accident. Actually he visited his family dentist one month after the accident according to Dr. Tuttle's records; however, after the visit to Dr. Tuttle, he saw a medical doctor who referred him to a dentist. It was not until June of 1987 that treatment was begun by Dr. Peak.