581 So.2d 273 (1991)
Judith C. HIGLEY, et al.
v.
Danny M. KRAMER, et al.
No. 89 CA 1938.
Court of Appeal of Louisiana, First Circuit.
March 5, 1991.
Rehearing Granted April 18, 1991.
Writ Denied May 2, 1991.
*275 David R. Kelly, Baton Rouge, for plaintiffs-appellants Judith Carol Higley and John Douglas Higley.
Stanley K. Hurder, Baton Rouge, for intervenorState Employees Benefits Program.
Brent E. Kinchen, Baton Rouge, for defendants-appellees Danny M. Kramer, et al.
Before LOTTINGER, SHORTESS and CARTER, JJ.
SHORTESS, Judge.
Judith C. Higley (plaintiff), her husband, and her two sons bring this appeal complaining that the jury award resulting from their personal injury and consortium complaint against Danny M. Kramer, his wife Iris Kramer, his minor child Kim, and the St. Paul Guardian Insurance Company was inadequate. The jury assessed fault entirely to the Kramers, with Iris Kramer being apportioned 60% of the fault and Kim Kramer being assessed 40% of the fault. Judgment was rendered accordingly. That judgment has become final, as none of the defendants have appealed or answered plaintiff's appeal. The only issues before the court are the adequacy of the damages awarded to plaintiff by the jury and the failure of the jury to award plaintiff's husband and sons anything for loss of consortium. The special verdict form executed by the jury shows that plaintiff was awarded a total of $85,118.04,[1] made up of the following elements, as taken from the special verdict form:[2]
*276 
Roughly speaking the jury awarded plaintiff $55,000.00 in general damages (pain and suffering, permanent injury and disability and loss of enjoyment of life), $2,400.00 in lost wages, and $1,500.00 in future medical expenses.
After judgment was signed, plaintiff filed a motion for judgment notwithstanding the verdict (JNOV) on the grounds that reasonable men could not have reached a different conclusion but that the general damage award to her was inadequate and that the failure to award any amount whatsoever to her husband and sons was manifestly erroneous. The trial judge denied the motion for JNOV, and in his oral reasons for judgment stated: "the court finds that the facts and circumstances concerning plaintiff's accident, activities, injuries and treatment do not point so strongly and overwhelmingly [to] a higher general damages award...." The trial judge further found that the jury did not abuse its discretion in failing to make any awards for loss of consortium.
The trial court's failure to grant the JNOV is specified as an error. In the alternative, plaintiff contends that her award was grossly inadequate and that the jury abused its great discretion therein. Finally, it is alleged that the judge erred by failing to award plaintiff's husband and sons any damages on their consortium claims.
Plaintiff argues that if we find clear error on the part of the jury and also error on the part of the trial court in denying the JNOV, we as an appellate court can make an independent assessment of damages on appeal. Because we find no abuse of discretion *277 in the trial court's denial of the JNOV, we pretermit this issue. However, since we find that the jury abused its great discretion in plaintiff's general damages award, we can foresee that without further explanation some inconsistency in these two findings may be perceived. Accordingly, a brief discussion of the distinction between appellate review and the function of the trial court in post-verdict proceedings, is required.
In deciding a JNOV, the trial court does not act as an initial appellate court; the trial court neither weighs nor makes any other qualitative evaluation of the evidence. See Cupstid v. Harrison Hardwood Manuf. Co., 552 So.2d 1223, 1225 (La.App. 3d Cir.1989), writ denied, 558 So.2d 572 (1990). Since amendment of LSA-C.C.P. art. 1811, a JNOV may be granted on the issue of damages. LSA-C. C.P. art. 1811(F); Robertson v. Penn, 472 So.2d 927, 929 (La.App. 1st Cir.), writ denied, 476 So.2d 353 (1985).[3] The article does not provide the standard; as a result, Louisiana courts have looked to the federal counterpart, Rule 50 of the Federal Rules of Civil Procedure. Robertson, 472 So.2d at 929. This standard is commonly articulated as follows:
On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidencenot just that evidence which supports the non-mover's casebut in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.
Id., quoting Boeing v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (en banc).
This standard proves problematic in application where the issue is damages. This issue cannot be answered with a bright-line response (e.g., "yes" or "no") but rather is to be answered within a range of acceptable responses. The standard, however, presupposes a single correct answer and requires a factual posture which rules out all but this one answer, i.e., "the facts and inferences point so strongly and overwhelmingly ... that reasonable men could not arrive at a contrary verdict." Application of this standard to the facts of a personal injury case is further complicated by the much discretion afforded the jury in determining damages. LSA-C.C. art. 1999; Carlin v. Blanchard, 537 So.2d 303, 309 (La.App. 1st Cir.1988). It is this much discretion that limits the scope of appellate review of jury awards to allow an amendment, upon the finding of clear error, only to the minimum (highest or lowest) within the jury's discretion. See Coco v. Winston Industries, 341 So.2d 332, 335 (La.1977).
The Boeing standard requires independent analysis of the evidence, Willis v. LP & L, 524 So.2d 42, 46 (La.App. 2d Cir.), writ denied, 525 So.2d 1059 (1988), but it is essentially a threshold determination of sufficiency. See Smith v. Transworld Drilling, 773 F.2d 610, 615 (5th Cir. 1985). In determining a JNOV the trial court does NOT weigh conflicting evidence and inferences OR make credibility determinations. Boeing, 411 F.2d at 375. Appellate evaluation of the evidence, however, in a restrictive manner, does entail a weighing of evidence. See Rosell v. Esco, 549 So.2d 840, 844-45 (La.1989) ("[w]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of *278 appeal may well find manifest error or clear wrongness...."
When a trial court grants a JNOV as to damages, both the decision to grant (i.e., that reasonable men could not have arrived at a contrary conclusion) and the resulting increase or decrease in the award, must be reviewed. The trial court's assessment of damages is an independent determination, not constrained by Coco. See Rickerson v. Fireman's Fund Ins. Co., 543 So.2d 519, 523 (La.App. 1st Cir.1989). We in turn review that award under the standard of manifest error, and are constrained by Coco. See Robertson, 472 So.2d at 929; Acosta v. Pendleton Memorial Methodist Hospital, 545 So.2d 1053, 1061 (La.App. 4th Cir.), writs denied, 551 So.2d 637, 638 (1989); Brossette v. Professional Transportation, 562 So.2d 1018, 1021 (La.App. 3d Cir.1990). The difference results from the distinction between the function of the trial court in passing upon a motion for a JNOV and the function of an appellate court conducting appellate review. The determination by the trial court, then, that the evidence is minimally sufficient to withstand a JNOV, does not foreclose a finding by this court, upon appellate review, of manifest error. The very stringent requisite for a JNOV will, in the ordinary case of manifest error, not be met.
The operative facts as gleaned from the record and transcript show that plaintiff, on September 10, 1985, while proceeding east along U.S. Highway 190 in Mandeville was struck broadside by defendant's minor daughter Kim, an unlicensed driver who was helping her mother run errands and at the same time getting a driving lesson, who turned left directly into plaintiff's path, striking her vehicle on its left side. Plaintiff had no immediate symptoms, but shortly after returning home, complained of a headache.
Plaintiff and her family were in the process of moving from Mandeville to Baton Rouge at the time. In fact, the moving van was at their house loading furniture when the accident happened. After the move was completed and during the week that the Higleys were getting settled in Baton Rouge, plaintiff's complaints of headaches continued and she began to complain of soreness in her neck and back, together with a dull, burning sensation. These complaints worsened with time. She knew no doctors in Baton Rouge, but when her son Robert broke his arm at school in October, Dr. Charles Strange, an orthopedist, treated him. Plaintiff asked Strange about her problem, and he saw her on December 5, 1985. Dr. Strange testified that he remembered talking to plaintiff about her problems while treating Robert but could not be specific. His orthopedic examination was essentially negative and within normal limits. His diagnosis was classic flexion extension soft tissue strain of the cervical and lumbar spines.
Plaintiff saw Strange on July 11, 1986, with continued complaints of a stiff neck and back, afternoon headaches, increased arm and leg pain and radiating pain from her back into her legs. Dr. Strange ordered a CT scan and felt she had enough complaints to refer her to a neurosurgeon, so he sent her to Dr. William Fisher. The CT scan Strange ordered showed no problem in her low back but did reveal a rather mild disc bulge at C-7. Strange had put plaintiff on Naprosyn, when he saw her on January 16, 1986, and noted she was doing better. He felt that the symptoms he saw plaintiff for were related to her September 1985 accident.
Plaintiff saw Dr. Fisher only on two occasions, August 11 and September 8, 1986. She testified that Dr. Fisher made her uneasy so she went to Dr. John R. Clifford, also a neurosurgeon, on October 2, 1986. When Dr. Fisher saw plaintiff, he noted complaints of pain and discomfort into the anterior aspect of the right lower leg and posterior aspect of her left lower leg, resulting from a September 1985 accident, which were intermittent and transient. Plaintiff also complained of headaches and numbness, especially when she raised her arms over her head. Dr. Fisher reviewed the CT scan ordered by Dr. Strange which showed the mild disc bulge at C-7 but felt it was insignificant because there were no clinical complaints tied to this finding. He *279 felt she needed more detailed study, so a MRI was ordered. When he saw her on September 8, 1986, the study had been done and revealed not only the C6/C7 bulging disc but also a small protrusion at the L5/S1 disc.
Fisher's diagnosis was quite guarded. He testified that her problems still could be muscular as he was unsure what relation the bulge had to her clinical complaints, so he felt that physical therapy was in order. Also, Fisher was unable to say whether her complaints were referable to her 1985 accident.
Plaintiff's complaints as noted by Dr. Clifford on his first visit with her on October 2, 1986, were chronic headaches which began after her September 1985 accident and emanated from the base of her head, some arm soreness, and numbness and tingling, especially in the right arm and hand.
Clifford's review of the prior tests, i.e., the CT and MRI, was identical to Fisher's, as were his relative negative findings upon his own neurological examination. He felt she had a mechanical "muscular/skeletal" complaint which would respond to physical therapy, which he ordered.
He saw plaintiff again on October 30, 1986, December 10, 1986, and January 14, 1987. She had dramatic improvement in her symptoms. He discontinued therapy on January 14 but advised her to continue her exercises at the "Y."
By February 27, 1987, plaintiff had a lot of complaints but had been to a dental seminar and thought she might have a TMJ (temporomandibular joint) problem.
After a long car trip in July 1987 and complaints of left neck and shoulder pain, Dr. Clifford did an MRI since she was presenting symptoms more consistent with the original MRI finding, especially from the C6 disc which was now more prominent.
Clifford recommended an anterior cervical fusion which plaintiff accepted. It was done on August 21, 1987. He felt it necessary since he had been treating her for eight to ten months without significant relief. He also testified that her clinical pattern had changed as well because the x-rays and MRI showed a "free fragment disc," the most severe, advanced stage of herniation.
Her post-operative course was uneventful. Dr. Clifford saw plaintiff on September 14, 1987, and October 12, 1987, and found that her neck complaints had subsided but she had back complaints and pain in the right hip. Clifford felt she had a rupture at the L4/5 level and recommended APLD (automated percutaneous lumbar diskectomy) surgery which she agreed to, and the operation was done on November 25, 1987. Clifford explained that the procedure is done with the patient on her side and awake so a response can be made if a probe comes too close to a nerve (like a dentist when drilling). The probe has a blade and a tiny hole which cuts disc material which is then sucked away through a hose leading from the probe line. This is outpatient surgery, and Clifford saw plaintiff afterward on December 16, 1987. She was not complaining of neck pain, and physical therapy was prescribed. On January 18, 1987, her leg pain was gone, but she complained of ligament pain in the right hip which was still giving her intermittent pain on March 18, 1988. At that time Clifford felt she needed biofeedback for pain control and continued therapy. On November 10, 1988, he felt she was doing well but that she had emotional problems over the way she was treated at home.
As far as plaintiff's residual course was concerned, Dr. Clifford restricted her from bending, stooping, squatting, and heavy lifting. He assigned a 10% residual disability to her neck and felt she would have problems because she did a lot of looking down while performing her duties as an office manager at a dental office. She also had hip problems and he felt she should not be jogging or playing tennis. His admonishment to plaintiff was "let comfort be your guide." He felt she would do well in the future from these two procedures but did testify that there was a 30% chance she would need surgery at the C5/6 level in the future. Dr. Clifford referred plaintiff to Dr. John Bolter, a clinical psychologist associated with his office.
*280 Dr. Clifford also felt that the slight accident plaintiff had in March 1987 was insignificant because there was no increase in symptoms thereafter. He felt that the September 1985 accident caused plaintiff's neck and back discs.
Dr. T.T. Lanius is a dentist. (Plaintiff is the office manager for the dentists who practice at his location.) He treated plaintiff for the dental aspects of her headache problems. Dr. Lanius performed an EMG (electromyogram) and an MKG which are scanning tests. The testing disclosed that plaintiff had several facial muscle groups in quite severe spasm. Her lower jaw was found to be retruded on closing with a torquing mechanism of the facial muscles and lower jaw (as the lower jaw closes, it torques to one side rather than in a simple hinge). Dr. Lanius fashioned appliances for plaintiff's mouth, specifically, fixed braces to treat the flaring anterior teeth together with a passive retainer in the palate of her mouth. He felt this procedure would help her headaches which in his opinion came from the problem associated with her retruded lower jaw. Within eight to ten days, plaintiff reported that her headaches were rapidly subsiding and shortly she had total relief. He testified that the only necessary further treatment was maintenance for the retainer which he said she should use for a lifetime but on a once-or-twice-a-week basis. His diagnosis was myofacial pain dysfunction syndrome. He agreed with Dr. Clifford that plaintiff did not have TMJ. He also felt that this problem pre-dated plaintiff's accident but had not been painful and that the accident "tipped it off."
Dr. John F. Bolter, a clinical neuropsychologist, saw plaintiff on January 10, 1989. His history indicated that plaintiff had a difficult time coping with her pain even though she was able to go to work every day. After a full day at the office she would be irritable when she got home, found it hard to relate to her family, and felt that they were angry with her. She also was unable to do her chores or engage in social activities.
Dr. Bolter did not feel plaintiff had a diagnosable condition, i.e., hers was not a clinical depression. She was very angry, so the only diagnosis he could make was "a life circumstance problem" but not a psychiatric illness. He also felt that her work was a very helpful distraction because it kept her attention away from her pain. He opined further "that's why it's so difficult when she gets home," and that personal problems make it harder to cope with pain but does not account for pain.
Without repeating the complaints given to the health care professionals as already set forth, plaintiff testified that her husband and sons tried to help but that she wasn't very good at asking for help, especially since she had always been able to do it herself; that she could only let her guard down at home and was tired and crabby and had horrible headaches when she got home from work, and just wasn't tolerant and patient with her whole family; that her physical activities (jogging, tennis, etc.) stopped, then her body changed and her muscles sagged; that she got amazing relief from her headaches after Dr. Lanius put the braces and retainer in her mouth; then everything else seemed to get worse, especially her neck, and she had neck and back surgery; that she felt better after this surgery but she still tired quickly and her neck was stiff and sore when she got home from work; that she has continued using a maid once a week since her recuperative period when her husband had a maid service to come in and do all the housework and cooking; and that she intends to get some family therapy.
John Douglas Higley, plaintiff's husband, testified that before the accident the family did many things together and that he and plaintiff had a good relationship; that shortly after the accident plaintiff developed headaches and mood changes; that plaintiff's headaches went away after Dr. Lanius's treatment; that after plaintiff's cervical fusion, the intense pain was gone but she still had pain and discomfort; that he has become a "couch potato" because he watches so much television and plaintiff is in bed at 7:00 to 8:00 p.m.; that he knows she doesn't do it to be spiteful but because *281 she is worn out, tired, and out of energy; that it is not much of a life and he is terribly frustrated but still loves her; that he had back surgery in the mid-1960's after an automobile accident; that he agrees with the testimony that he does no inside chores but helped more in the beginning; and that he probably helps less now because he got tired of complaints as to whether or not he was doing a good job.
Robert Higley is plaintiff's 17-year-old son. He testified that he and plaintiff had a very close relationship; that they played tennis and went swimming together; that he discussed his problems with her; that after the move to Baton Rouge he noticed that his mother changed and she was almost constantly in a bad mood; that she began yelling at him; that their activities together stopped and he stopped talking to her about his problems because it didn't seem like she had time or patience to talk; that he and his dad started doing housework but everything he did never seemed good enough for plaintiff, even though he was doing the best he could; that he would get yelled at for not doing as good a job as she thought was necessary.
Todd Higley is plaintiff's elder son. He testified that after the accident plaintiff had headaches and soreness in her neck and back; that he was away at school and didn't move back home until August 1986; that before the accident he had a close relationship with his mother; that since the accident a lot of tension had developed between family members.

QUANTUM
The sufficiency or insufficiency of an award turns upon the facts and circumstances peculiar to that particular case; our inquiry is whether the award for those injuries and their effect upon those claiming to have been damaged is a clear abuse of the much discretion vested in the finder of fact. Fruge v. Thornhill, 560 So.2d 909, 913 (La.App. 1st Cir.), writ denied, 567 So.2d 618 (1990). An examination of previous awards for similar injuries is appropriate only to the extent of determining whether the award under review is greatly disproportionate. Id.
In Fruge plaintiff sustained a cervical injury which was treated conservatively for three years, but she eventually underwent anterior cervical fusion, which resulted in anatomical disability of 15-20% with permanent movement restrictions. Plaintiff in Fruge also sustained a 6% disability of an upper extremity (the left hand) due to injuries to the ulnar artery. The jury awarded $18,000.00 for past and future pain and suffering[4] which we raised to $100,000.00 under the Coco standard of review. See Fruge, 560 So.2d at 914. A survey of recent awards for single-level spinal injuries was undertaken in Fruge which disclosed that the $18,000.00 pain and suffering award was greatly disproportionate and an abuse of the jury's much discretion. Id., discussing Morris v. State, DOTD, 461 So.2d 606 (La.App. 1st Cir. 1984); Rodrigue v. Firestone Tire and Rubber, 540 So.2d 477 (La.App. 1st Cir.), writs denied, 546 So.2d 179, 180 (1989); Rickerson v. Fireman's Fund, 543 So.2d 519 (La.App. 1st Cir.1989); Aucoin v. Hartford, 499 So.2d 1042 (La.App. 3d Cir. 1986). A multi-level spinal injury, however, depending upon the circumstances, may well call for a higher award. See LeBouef v. Gross, 506 So.2d 879, 880 (La.App. 1st Cir.1987) (where $250,000.00 was awarded for injuries including a ruptured, subsequently-fused cervical disc and bulging lumbar disc).
In making our appellate review of quantum, we have noted that the defense put on no evidence and relied entirely on cross-examination of plaintiff's witnesses. The award to plaintiff certainly must be accepted as the jury's conclusion that all of plaintiff's physical injuries were caused by the accident in question. All the medical experts were of that opinion. (Dr. Fisher was unable to say because he only saw plaintiff on two occasions.) This finding is certainly not clearly wrong, and our review *282 begins with the proposition that plaintiff's physical injuries were caused by defendants' sole negligence.
In reviewing mental anguish and emotional suffering, we are mindful of the admonition of our supreme court in Rosell:
In applying the manifestly erroneous-clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.

....
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the [fact finder] can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
Rosell, 549 So.2d at 845 (citations omitted).
Applying this law gives us no independent option to do what we might like to do if we were the trier of fact in this case. In view of the emotional problems emanating from plaintiff's family situation, we cannot say that the jury abused its great discretion in making what we infer was a nominal award for mental pain and emotional suffering.
There is no question, however, that plaintiff sustained an aggravation to an asymptomatic myofacial pain dysfunction syndrome. This problem caused severe headaches until June or July 1987 when Dr. Lanius performed his procedure. Plaintiff also had ruptured C6/7 and L4/5 which ultimately required surgery. Dr. Clifford assigned a 10% residual disability to her neck, felt that additional cervical surgery might be necessary in the future, and also felt that she will have continuing problems with her neck because of her occupational duties. Clearly, the jury abused its great discretion by only awarding plaintiff $55,000.00 for her general damages.
For these reasons, the lowest award that a reasonable fact finder could have made was $150,000.00, and we amend the award to increase it by $95,000.00. Coco v. Winston Industries, 341 So.2d 332.

LOSS OF CONSORTIUM
LSA-C.C. art. 2315 provides, in pertinent part:
Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person.
The elements of a spouse's loss of consortium claim include loss of love and affection; loss of companionship, impairment of sexual relations; loss of material services; loss of support; loss of aid and assistance, and loss of felicity. Finley v. Bass, 478 So.2d 608, 614 (La.App. 2d Cir. 1985). See also Lejeune v. Cook, 563 So.2d 1218, 1223 (La.App. 1st Cir.1990). The elements of a minor child's claim for loss of service and society is essentially the same without, of course, the sexual component.
Comparing the seven factors articulated in Finley, the evidence shows:
1. Loss of love and affection. Both plaintiff and the Higley men testified that they still loved each other, although Mr. Higley did say he is frustrated.
2. Society and companionship. Plaintiff testified that she goes to bed early because she works and is so run down after a day's work. Mr. Higley said he is a "couch potato" because plaintiff is in bed by 7:15 to 8:00 many nights. The sons don't do things with plaintiff as they once did.
3. Sexual relations. While Mr. Higley testified that he and plaintiff had an active sex life prior to the accident, he further stated that they have only had intercourse three times in three years because it is painful to plaintiff.
4. Right of performance of material services. The Higleys now have a maid one day a week.
5. Right of support (financial). There is no loss because plaintiff works more now than she did prior to the accident.
6. Aid and assistance. This is questionable because Mr. Higley, along with Robert *283 and Todd, do not help around the house for the reasons already stated.
7. Loss of felicity. It is obvious that the Higley men are not happy like they were prior to the accident.
Unquestionably, many of the items enumerated in Finley have been proven in this case. The jury erred in not giving at least a nominal award to plaintiff's husband and sons. It is fairly obvious that the jury was concerned about the cause of plaintiff's mental and emotional pain and suffering. They even gave some thought to a limited consortium award of $5,000.00 to be used solely for family counseling (see page two of jury verdict form). We feel that the very minimum that could have been awarded under the complex circumstances of this case was $6,000.00 to John Douglas Higley and $3,500.00 each to Robert and Todd Higley, and the judgment of the trial court is reversed to that extent.
For the reasons stated, the judgment of the trial court is amended to increase the jury verdict to plaintiff by $95,000.00. Further, the judgment which gave no award to John Douglas Higley, Robert Higley, and Todd Higley is reversed. Judgment is rendered in their favor as set forth above. All costs of this appeal are taxed to defendants.
REVERSED IN PART, AND AFFIRMED AS AMENDED.

ON APPLICATION FOR REHEARING
PER CURIAM.
Applicant asks that we grant a rehearing to award legal interest on the amended judgments. While it is not necessary to do so, see LSA-R.S. 13:4203, we choose to exercise our discretion to specifically state that legal interest from date of judicial demand until paid is included on all sums awarded to plaintiffs.
NOTES
[1] Pursuant to an intervention filed on behalf of the Board of Trustees, State Employees Group Benefits Program, $18,168.94 was awarded to it and defendants were given a credit for prior payments of $4,935.00.
[2] It is immediately obvious that the jury did not follow its instructions in answering the damages question for plaintiff (No. 5). It lumped items A, B, and C together rather than making separate awards for each item. This error has certainly contributed to the quantum problem in this case. Did the jury intend to award, for example, nothing or just a nominal sum for any item, but for the sake of expedience lump everything together? Many other questions also arise and could be articulated but suffice it to say, we are left in uncertainty about the three unspecified items. This error does not rise to one which would infirm the verdict, since neither party objected to the trial court or to us about it.
[3] The comments to LSA-C.C.P. art. 1811 indicate that section F, which provides expressly that the JNOV may be granted on the issue of liability or damages, or both, was intended to overrule Rougeau v. Commercial Union, 432 So.2d 1162 (La.App. 3d Cir.), writ denied, 437 So.2d 1149 (La.1983).
[4] It is to be noted that the total award of general damages was $58,000.00: $18,000.00 for past and future pain and suffering; $19,000.00 for past and future mental anguish and emotional distress; and, $21,000.00 for disability.