623 So.2d 139 (1993)
Wayne L. KING
v.
OUR LADY OF THE LAKE REGIONAL MEDICAL CENTER, et al.
No. 92 CA 1193.
Court of Appeal of Louisiana, First Circuit.
July 2, 1993.
*140 Michael R. Connelly, Baton Rouge, for plaintiff-appellant Wayne L. King.
*141 T. MacDougall Womack, Baton Rouge, Patrick C. Blanchard, Donaldsonville, for defendant-appellee Our Lady of the Lake Regional Medical Center.
Before CARTER, LeBLANC and PITCHER, JJ.
CARTER, Judge.
This is an appeal from a trial court judgment in an action for medical malpractice.

FACTS
On January 7, 1987, Wayne L. King, plaintiff, was admitted into Our Lady of the Lake Regional Medical Center ("OLOL"). On January 12, 1987, he underwent double coronary bypass surgery. Shortly after the surgery, plaintiff began experiencing severe abdominal pains. On January 18, 1987, Dr. L.P. Laville, Jr. diagnosed plaintiff with gallbladder problems and ordered that he undergo a cholecystectomy (removal of the gallbladder). Dr. Laville spoke with plaintiff and his sister, Mrs. Arlene Babineaux,[1] explaining the risks of the surgery, and instructed the hospital staff to get the written consent form signed. On the morning of January 19, 1987, Mrs. Babineaux signed the hospital's surgical release form. During the surgery, it was discovered that plaintiff's gallbladder had previously been removed.[2]
On September 9, 1988, plaintiff filed the instant medical malpractice action against OLOL for unnecessary surgery.[3] Plaintiff also alleged that while he was recuperating from the bypass surgery, but prior to the surgery for the removal of his gallbladder, OLOL employees administered morphine to him, despite plaintiff's allergy to morphine being specifically noted on his chart and medical records. Plaintiff contended that the administration of the morphine and certain other drugs caused the abdominal pains which the defendants concluded were the result of gallbladder problems. Plaintiff further alleged that he was awake and conscious during the period in which his gallbladder surgery was being discussed and that he was capable of making a decision regarding surgery. The petition also alleged that plaintiff was required to undergo an additional surgery for a hernia which developed as a result of the gallbladder surgery weakening the abdominal wall.[4]
The trial was held on January 27, 1992. On February 28, 1992, the trial court issued written reasons, finding that OLOL was not at fault in obtaining the medical release from plaintiff's sister because plaintiff was not in any condition to sign the release. The court further found that OLOL had no other involvement in plaintiff's unnecessary surgery. However, the court found that OLOL was at fault in administering morphine and codeine to plaintiff since he was allergic to these drugs and the medical records indicated such fact. The court found that the administration of the drugs constituted a battery upon plaintiff. In the judgment, signed on March 23, 1992, plaintiff was awarded $1,500.00 in damages. From this judgment, plaintiff appealed, contending that the trial court erred in the following respects:
1. The trial court erred manifestly in concluding that the hospital was not at fault in obtaining surgical consent from appellant's sister instead of appellant.

*142 2. The trial court erred manifestly in concluding that "other than obtaining the release, the hospital had no other involvement in Mr. King's unnecessary surgery."
3. The trial court erred manifestly in concluding that no physical damage resulted to appellant when the hospital administered drugs to him which he was allergic to and awarding only $1500.00 to appellant.

CONSENT
Plaintiff contends that the trial court erred in not finding that OLOL was at fault for obtaining surgical consent from plaintiff's sister, rather than from plaintiff himself. Plaintiff claims that he "was perfectly capable of giving or refusing his consent for the surgery."
Consent to medical treatment is addressed in LSA-R.S. 40:1299.40 A, which provides, in pertinent part, as follows:
[W]ritten consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which ... is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. (Emphasis added)
LSA-C.C. art. 1918 addresses legal capacity, stating that "all persons have capacity to contract, except unemancipated minors, interdicts, and persons deprived of reason at the time of contracting." The expression "persons deprived of reason" is designed to include all of the varieties of derangement that have been acknowledged by the Louisiana jurisprudence. Comments, LSA-C.C. art. 1918. One type of person who is "deprived of reason" is one who is under drug sedation. Brumfield v. Paul, 145 So.2d 46, 47 (La.App. 4th Cir.1962).
A review of the testimony given at trial in the instant case indicates that plaintiff was under heavy sedation during the period between the bypass surgery and the surgery to remove his gallbladder.
Dr. Ginger Shows testified by deposition that during the weekend between the bypass surgery and the gallbladder surgery plaintiff was "extremely agitated and not very coherent." She testified as follows:
Q. At what time, if at any time, prior to the exploratory surgery, did you feel that Mr. King needed the assistance of a family member or other person to make decisions or to give a meaningful decision as to whether or not he should have surgery?
A. Well, over the weekend he had been having so much pain and had required large amounts of IV narcotics. And it was about that time that I felt like, you know, he really wasn't capable of making decisions about things like that. He was in a great deal of pain, and I believe it was then that we had to call on the family members to advise us as to what route we wanted to take.
The day prior to plaintiff's gallbladder surgery, Dr. Laville spoke with plaintiff and his sister regarding the surgery. Dr. Laville testified as follows:
I met Mr. King and I examined him and examined his records, talked to him as best I could. Mr. King was not a good historian at that point, in that he was having decided abdominal discomfort and he was being treated for this with narcotics, and his conversation was not acute, was not one that you could really hang your hat on, if you will. On the other hand, his sister, a Mrs. Babineaux, was there and she was as alert as human being, and I was able to talk with her.[5]
The testimony of Mrs. Babineaux reveals that her brother was in no condition to consent to surgery. She testified as follows:
Q. Had you talked to him the day before [the morning of her brother's surgery, January 19, 1987]?
A. About nothing. I spoke to him, you know. I mean, there was no conversation.
*143 Plaintiff's own testimony, as a whole, indicates that he remembers very little about what was happening or about his condition during the period preceding the gallbladder surgery. Even plaintiff's own expert witness, Dr. Joseph Bussey, acknowledged that plaintiff was so "disoriented" that he could not give his prior medical history to Dr. Laville.
Despite the overwhelming testimony to the contrary, plaintiff contends that he was capable of giving or refusing his consent. In support of this contention, plaintiff relies on the nurse's notes for the morning of January 19, 1987 (the date of surgery), which indicate that plaintiff was "awake and alert" at 7:30 a.m. Plaintiff argues that, given his alertness, there was no reason for the hospital staff not to obtain his consent for surgery. However, during the period of time prior to surgery when he was allegedly lucid, plaintiff admittedly failed to inform medical personnel that his gallbladder had previously been removed. Dr. Laville examined plaintiff at 8:45 that morning (January 19, 1987), and plaintiff did not at any point object to the procedure.
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State of Louisiana, Through Department of Transportation and Development, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). When the trial court's or jury's findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings. Rosell v. ESCO, 549 So.2d at 844. The reviewing court must always keep in mind that if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Housley v. Cerise, 579 So.2d 973, 976 (La. 1991); Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106, 1112 (La.1990). Consequently, when there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Sistler v. Liberty Mutual Insurance Company, 558 So.2d at 1112.
After reviewing the testimony and the record in the instant case, we find that the record amply supports the trial court's finding that plaintiff "was not in any condition to sign the release and that his sister was the only competent person available to sign the release." Therefore, we conclude that the trial judge was not manifestly erroneous in finding that OLOL properly obtained the surgical consent from plaintiff's sister, rather than from plaintiff himself.

UNNECESSARY SURGERY
Plaintiff contends that the trial court failed to consider certain acts of negligence by OLOL employees which led to plaintiff's unnecessary surgery. Plaintiff asserts that the hospital failed to carry out a treating physician's orders for diagnostic testing. Plaintiff argues that if the orders had been carried out and additional diagnostic testing been done, there would have been ample evidence to suggest that plaintiff did not have a gallbladder and, therefore, that the surgery was unnecessary.
Plaintiff specifically refers to the order sheet contained in the medical records which shows that on January 18, 1987, an ultrasound was ordered and performed at approximately 2:00 p.m. The ultrasound, however, was inconclusive because the gallbladder had not visualized. Dr. Francis Puyau, the radiologist, attributed the inconclusiveness to plaintiff's weight and the fact that plaintiff had eaten prior to the examination. As a result, Dr. Ginger Shows ordered that plaintiff undergo a second ultrasound with instructions that plaintiff fast until that time. However, the second ultrasound was never performed. Dr. Ginger Shows explained why a second ultrasound was not performed:
Sometimes that's [a second ultrasound is] done. And I think his condition had continued to worsen. He was in more and more pain, and that's why the PiPiDa scan was ordered, because it was felt that perhaps waiting until all the food was gone and trying to get an ultrasound which may not visualize [the gallbladder] anyway because *144 of his size was probably not the best diagnostic test to do.
Dr. Michael T. Hackler, who also treated plaintiff for his abdominal pains, stated that:
Even if we had repeated it [the ultrasound] the next day, the man's obesity may haveeven if the gallbladder was there, would have prevented us from seeing it. So, again, based on my clinical experience, the nature of the man's pain, the fact that it was not relieved with pain medication, the fact that it did not show up on the PiPiDa scan, the fact that he did not tell us he'd had his gallbladder removed, all these in conjunction,[I] would have gone ahead and would not have deferred any further judgment based on another ultrasound.
Plaintiff further contends that the trial court erred in that, while acknowledging the fact that hospital employees administered plaintiff drugs to which he had a known allergy (morphine and Tylenol # 3, which contains codeine), the trial court failed to consider the relationship between plaintiff's allergic reaction to those drugs and the abdominal pains which ultimately led to the unnecessary gallbladder surgery.
Plaintiff testified that, approximately one year prior to the gallbladder surgery, he discovered that he was allergic to morphine when it was administered to him during hospitalization for a heart attack. He stated that the allergic reaction to the morphine resulted in severe abdominal pains, much like the pains he experienced prior to the gallbladder surgery.
In support of plaintiff's contention that he suffered an allergic reaction to the administration of morphine, plaintiff offered the testimony of his sister. Mrs. Babineaux testified that her brother was "convulsing" when she visited him on January 20, 1987, the day following plaintiff's surgery. She testified as follows:
Q. Do you recall an incident where morphine was given to your brother?
A. I definitely do.
Q. How do you know that he had been given morphine?
A. Because I thought he was going to die. He was convulsing and just continued to do that. And I asked the nurse about it, and she told me that a nurse earlier on another shift had givenhad administered morphine. And I got a little angry and I told her, I said, well, why? This sign hasn't moved. And I said, they gave him morphine even after reading this sign. I said, how can, you know, a nurse give him morphine when he's highly allergic to it?
Q. Do you recall the name of the nurse?
A. No, I don't.
Q. How long did this period of convulsions last?
A. A good while. A good day. A good whole day.
Q. And when you say convulsions, would you describe for me exactly what was happening?
A. Something like a hiccup, you know. And then there was a container under the bed where blood was in there. And, of course, I didn't know, you know, what that was for.
Q. Was he conscious or unconscious when this was occurring?
A. I feel like that he was unconscious.
However, Nurse Susan Dragna testified that plaintiff was not administered morphine until the morning of January 21, 1987 (the day following Mrs. Babineaux's visit). Furthermore, the nurse's notes do not indicate that plaintiff was convulsing on January 20, 1987, or on any other day. Nurse Dragna explained that the "convulsions" described by Mrs. Babineaux were indicative of the discomfort caused by the use of a respirator and endotracheal tube following surgery.
Further, Nurse Dragna testified that the medical records do not indicate that plaintiff exhibited any adverse reaction to the administration of the codeine. Moreover, plaintiff's hospital records note that plaintiff's abdominal pains did not begin until approximately sixty-four (64) hours after the Tylenol # 3 had been discontinued.[6]
*145 Dr. Shows testified that the dose of morphine given plaintiff had no adverse effects on plaintiff:
Q. There seems to be some question about whether or not Mr. King may have been allergic to penicillin, morphine, that kind of thing,
A. Uh huh.
Q. and he either did or may have received one dose of morphine IV pursuant to a physician's orders
A. Uh huh. Yes, I remember that. Uh huh.
Q. before it was discontinued. Assuming that did, in fact, occur, are you aware of any difficulty he had from
A. No, I'm not aware of it.
Q. the administration of that morphine?
A. I think it was just about one milligram or a very small amount.
Q. A milligram or a half milligram?
A. And no apparent ill effects were noted.
Q. No complaints from him about any ill effects?
A. No.
Q. I noticed that you signed off on the final diagnosis and so forth and no mention is made of any difficulty from morphine, if in fact he got that?
A. He had noas far as I could detect from the records in ICU, no increase in his heart rate or no increased respiratory difficulty or anything which would demonstrate an adverse reaction to medication.
Plaintiff's expert, Dr. Bussey, testified that the symptoms of an allergic reaction to codeine include abdominal cramping. He indicated further that the administering of Tylenol # 3 to plaintiff could have been the cause of plaintiff's abdominal pains.
However, after performing an exploration of plaintiff's abdomen, Dr. Laville attributed plaintiff's abdominal pain to a distended intestine, not to the administration of the drugs. He testified as follows:
Q. After you determined that the man did not have a gallbladder, did you continue the surgery?
A. I did. I looked throughout his abdomen for a possible explanation of his discomfort, and I found noor nothing to attribute it to other than some mildly distended intestine, which we call ileus, that probably is the whole crux of why this man became progressively worsened.
Q. During your exploration of the abdomen did you find any signs at all of trauma that may have caused this pain?
A. No. And we purposefully looked at these, meaning his liver and his spleen and his kidneys. They were purposefully looked at. And no, sir, I did not.
After reviewing the entire record, we are convinced that the record supports the trial court's finding that OLOL had no involvement in plaintiff's unnecessary surgery, either as a result of the failure of the completion of the diagnostic testing or the administration of the drugs to which plaintiff was allergic. Therefore, the assignment of error is without merit.

DAMAGES
Plaintiff contends that the trial court erred in finding that plaintiff suffered no physical damage from the administration of the drugs. To support this contention, plaintiff points to the testimony of Mrs. Babineaux, which, as discussed earlier, indicated that when she visited her brother on January 20, 1987, she discovered that he had been given morphine. She testified that plaintiff was "convulsing" and that she thought he was going to die. She described the convulsions as being "something like a hiccup."
However, Nurse Dragna testified that plaintiff was not administered morphine until January 21, 1987, the day following Mrs. Babineaux's visit. Furthermore, Nurse Dragna stated that the nurse's notes did not indicate that plaintiff was "convulsing" at any time during his hospitalization. She explained that the "convulsions" described by Mrs. Babineaux were possibly indicative of the discomfort caused by the use of a respirator *146 and endotracheal tube following surgery.
Plaintiff also contends that Dr. Bussey's statement that the administration of the codeine could have caused plaintiff's abdominal pains supports an increase in the damage award. However, the abdominal pains did not begin until approximately sixty-four hours after the Tylenol # 3 (containing codeine) had been discontinued. Both Dr. Shows and Nurse Dragna testified that plaintiff exhibited no adverse reaction to the morphine or codeine. Moreover, after exploratory surgery, Dr. Laville attributed plaintiff's abdominal pains to a distended intestine.
When the trial court's findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings. Rosell v. ESCO, 549 So.2d at 844. When there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Sistler v. Liberty Mutual Insurance Company, 558 So.2d at 1112. Considering all of the testimony and the record before us, we cannot say that the trial court was manifestly erroneous in finding that plaintiff failed to establish that he suffered physical damage from the administration of the drugs.
Plaintiff also contends that the trial court erred in awarding only $1,500.00 in damages. Before an appellate court can disturb an award of damages made by the trial court, the record must clearly reflect that the trier of fact abused its discretion in making the award; only then will the appellate court make appropriate adjustment. Reck v. Stevens, 373 So.2d 498, 501 (La.1979); Haney v. Francewar, 588 So.2d 1172, 1179 (La.App. 1st Cir.1991); Higley v. Kramer, 581 So.2d 273, 281 (La.App. 1st Cir.), writ denied, 583 So.2d 483 (La.1991). We find no abuse of discretion in the trial court's damage award of $1,500.00 for the battery committed upon plaintiff.
Plaintiff reasons that additional damages are warranted because the unnecessary gallbladder surgery caused him to develop a hernia, which required that he undergo an additional surgery. However, since we have found that the trial court did not err in finding that OLOL was not responsible for plaintiff's unnecessary surgery, it is unnecessary to address this issue.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of the appeal are assessed against plaintiff.
AFFIRMED.
NOTES
[1] Arlene Babineaux remarried prior to trial and became Arlene Blanchard. However, we will refer to her as Mrs. Babineaux throughout this opinion.
[2] On OLOL's admittance form, plaintiff did not indicate that his gallbladder had previously been removed. However, plaintiff listed several other "previous hospitalizations" on the form.
[3] The claim against Dr. Laville was settled prior to trial, leaving only the claim against OLOL to be heard by the trial court. Therefore, the only issues on appeal are those related to the alleged malpractice by OLOL.
[4] On October 31, 1990, plaintiff filed a supplemental petition. Plaintiff alleged that while he was in intensive care at OLOL, recovering from bypass surgery, he fell from his bed and injured his ribs. He further alleged that his fall was concealed from the physicians, and it therefore affected his diagnosis.

On January 2, 1991, OLOL filed a peremptory exception raising the objection of prescription. OLOL contended that the claim asserted in the supplemental petition did not relate back to the filing of the original petition. On February 8, 1991, the trial court granted the exception and dismissed any cause of action arising out of the alleged fall from the hospital bed.
[5] It was not indicated during the conversation with Dr. Laville that plaintiff's gallbladder had been previously removed.
[6] The Tylenol # 3 was administered to plaintiff at 9:30 a.m. on January 14, 1987, and was discontinued at 9:30 that evening. Plaintiff's abdominal pains did not begin until approximately sixty-four hours later at 1:15 p.m. on January 17, 1987.