454 So.2d 1193 (1984)
Sylvia ANDREWS
v.
LOUISIANA COCA-COLA BOTTLING CO., LTD., W. Breaux, Commercial Union Insurance Company and James Steward.
No. CA 1723.
Court of Appeal of Louisiana, Fourth Circuit.
July 31, 1984.
Rehearings Denied September 27, 1984.
Writ Denied November 9, 1984.
*1194 Robert P. Charbonnet and Wayne E. Garrett, Charbonnet & Charbonnet, New Orleans, for plaintiff-appellant.
Normand F. Pizza and Michael R. Zsembik, Reuter, Reuter, Reuter & Pizza, New Orleans, for defendant-appellant.
Anthony J. Livaccari, Jr., Brough & Livaccari, New Orleans, for defendants-appellees.
Before REDMANN, GARRISON and BARRY, JJ.
GARRISON, Judge.
This is an appeal from a judgment of the district court rendered June 22, 1983, granting damages in the amount of $5,179.00 to plaintiff, Sylvia Andrews, a guest passenger, finding the drivers of both vehicles each 50% negligent, and ordering both drivers, an employer, and their respective insurers to pay 50% of the amount awarded.
From that judgment which we affirm, plaintiff appeals, alleging that the amount awarded is so low as to constitute a clear abuse of discretion.
Additionally, defendant, La. Coca-Cola Bottling Company appeals alleging that the trial court erred in finding that its driver, Welman W. Breaux was negligent in causing the accident at issue.
On March 4, 1981, Sylvia Andrews and her sister were guest passengers in a vehicle driven by James Steward. Mr. Steward had agreed to drive plaintiff to Moffet's *1195 Pharmacy on St. Charles Avenue in New Orleans for the purpose of having a prescription filled. The Steward vehicle was outside of Moffet's Pharmacy and all three people were in the car when the accident occurred. Mr. Steward's insurer is Commercial Union Insurance Company.
Welman W. Breaux was driving a delivery truck owned by his employer, La. Coca-Cola Bottling Co. Although it was not part of his regular route, on the date in question Mr. Breaux was instructed by his employer to make a delivery stop at Moffet's Pharmacy. The accident occurred at approximately 3:00 p.m. on a bright, sunny day.
At this point the testimony differs dramatically. Both Steward and Andrews testified that their car was parked, that the motor was off, and that in disembarking from their vehicle, Mrs. Andrews stepped directly onto the curb and was not required to step into the street prior to stepping onto the curb. They further testified that the truck hit their vehicle in an ill-fated attempt to parallel park and/or turn.
Mr. Breaux testified that the car's motor was running, that the car was parked 3 to 4 feet away from the curb, thus protruding into the street, and that the Steward vehicle pulled out into the street, hitting the truck.
There is no police report in the record and there are no photographs of the damage to either vehicle. Mrs. Andrews testified that the Steward vehicle was hit as follows:
"Q. You don't know where the truck hit the car, do you?
A. Yeah.
Q. Where did it hit the car?
A. In the front of the car. On the driver's side.
Q. Did it hit in the left front fender area?
A. Around that area close to the door.
Q. Close to the door?
A. Around it. Yes.
Q. Close to the door or close to the front fender?
A. I guess between the front fender and the door.
Q. You're certain of that?
A. I wouldn't say that I was really certain of it because I didn't really know. I wasn't even thinking about the car, you know. I was thinking about after the car hit us. And how it was, really was a surprise to me, you know, after we had parked there.
Q. When we took your deposition on February 2, 1982, I'm looking at page 15 of the deposition, I asked you, `Did the truck hit the front of the car or back of the car?', and your answer was then, `I'm not sure. I know it was on the driver's side.'
A. That's the same thing I'm telling you now.
Q. But you don't know where on the driver's side, do you?
A. I know it had to be close to the front area.
Q. All right.
A. Between the door and fender." (Tr. p. 21-22).
James Steward testified as follows:
"Q. After the collision occurred where did his vehicle come to rest? Where did he stop? After the two cars collided about where did his vehicle stop?
A. His vehicle was still right to my car where he hit me. Where the back tire hit me on the left.
Q. Was itthat would be his right back tire?
A. Yes.
Q. The area of his right back tire made contact with what area of your vehicle?
A. On the front fender of my vehicle.
Q. On the left side?
A. It was on the left side.
Q. That's the driver's side?
A. The driver's side. That's right." (Tr. p. 75).
Welman Breaux testified as follows:
"Q. At the time you noticed him what was his vehicle doing?
A. Sitting there parked. Waiting.

*1196 Q. As you proceeded to pull into Moffett's Drug Store how fast were you going?
A. I would say about five miles. I was getting ready to park. I was driving in to park.
Q. Where was it your intention to park, parallel to the curb on St. Charles?
A. Yes, it was.
Q. Now, was there a collision between your vehicle and the Steward vehicle?
A. When you say "collision" what do you mean?
Q. Was there contact between the two vehicles?
A. Yes, there was.
Q. The contact occurred while you were in the process of trying to bring your truck in line with the curb?
A. Yes.
Q. What part of your vehicle struck which part of Mr. Steward's vehicle?
A. Well, I didn't strike Mr. Steward's vehicle. He struck the truck. Struck the tire rim of the truck. As I was coming up I noticed he and the lady, I don't know if they were arguing or fussing, but they were talking. I seen him as I was pulling up. I got bad vibes and said, `I'd better watch the car' because he wasn't paying attention to what he was doing." (Tr. p. 86-87).
On appeal, the standard to be applied is whether the trial judge was manifestly erroneous in his factual determinations. Canter v. Koehring Co., 283 So.2d 716 (La., 1976); Arceneaux v. Domingue, 365 So.2d 1330 (La., 1978). The accident at issue is one of those cases in which no one will ever know what really happened. This court, however, must give great deference to the judgment of the trial judge who is in a position to observe the demeanor of the witnesses in assessing credibility. It cannot be said that the trial judge was manifestly erroneous.
Turning to the second issue on appeal, it should be noted that plaintiff first visited her physician, Dr. Nathaniel D. Ross two days after the accident on March 6, 1981 with complaints of headaches, pain and stiffness in the neck, shoulder, lower back and knees. Dr. Ross's examination revealed:
"... an abrasion of the forehead about an inch to inch and a half area. Swelling and tenderness in the immediate surrounding area. The neck showed restricted range of motion in all directions. The neck pain was aggravated by attempts to flex, extend or rotate. There was spasm and tenderness in the posterior paraspinous cervical muscles on palpation. The shoulders, restricted motion of both shoulders. Pain aggravated by motion. Tenderness in both supraclavicular areas and in both shoulder girdle areas. The lumbar sacral spine showed restricted range of motion. The low back pain was aggravated by flexion, extension and rotation. There was a spasm and tenderness in the lower back from the region of the second lumbar to the first sacral vertebrae area. The straight-leg raising and Lasegue's tests were negative. There was tenderness and minimal swelling of both knees in the patella areas. The neurological examination shows the cranial nerves to be intact. The deep tendon and cutaneous reflexes were normal. There was no abnormal reflex. X-rays taken on 3/24/81 and multiple views showed straightening of the cervical spine normal lordotic curve consistent with muscle spasm and irritability." (Tr. p. 41-42).
Dr. Ross's diagnosis at that time was:
"... contusion, abrasion and swelling of the forehead, sprained cervical musculoskeletal system, contusion and sprain of both shoulders, lumbosacral sprain and contusion of both knees." (Tr. p. 43).
Dr. Ross prescribed pain medication, muscle relaxants, cortisone injections, microwave diathermy, and ultrasound therapy. She was given a cervical collar to wear on the neck and a lumbar sacral brace. She was advised to use home heat treatments and to sleep on hard surfaces. She showed gradual improvement and was discharged on July 14, 1981 with a referral to *1197 an orthopedist. The discharge diagnosis provided:
"... she had complete range of motion of the cervical and lumbosacral spine with minimal pain at the extremes of rotation."
"She had minimal pain at that time. The neurological examination was normal and then she was discharged on this occasion. At that time she was told to discontinue the cervical collar and lumbosacral brace and given muscle relaxants and advised to return if symptoms reoccurred." (Tr. p. 48).
During the period from March 6th through July 14th, plaintiff had 38 treatments from Dr. Ross's office totaling $1,060.00.
Some three weeks later, on August 23rd, plaintiff returned to Dr. Ross's office with complaints of neck stiffness and pain as well as lower back stiffness and pain. Dr. Ross's examination at that time revealed the following:
"The neck showed restricted range of motion on flexion, extension and rotation of lateral motion, and the neck pain was aggravated by motion and continued minimal spasm on palpation to the posterior paraspinous cervical muscles. The lumbar spine showed restricted range of motion of the lumbar spine, and flexion, extension and rotation and lateral motion of the low-back pain was aggravated by motion. There was tenderness on palpation from the third to first sacral vertebrae areas. The straight-leg raising test was positive fourteen inches bilaterally. The neurological examination, the complete neurological examination including a fundoscopic examination revealed no evidence of abnormal neurological findings." (Tr. p. 45).
At that time Mrs. Andrews was placed on microwave diathermy and ultrasound therapy. She was required to recommence wearing both the cervical collar and the lumbo sacral brace; she was once again advised to sleep on a hard surface. Additionally she was prescribed Parafon Forte, two tablets four times a day, injections of Dicatron, and Tylenol No. 3 with ½ gram of Codeine, two tablets every four hours. Plaintiff remained under Dr. Ross's care from August 3rd through October 26, 1981, during which period she was treated on 17 occasions. Dr. Ross's bill for that period is $490.00.
The trial judge provided the following oral reasons for judgment:
"The Court, having listened to the testimony of all of the witnesses, the plaintiff and the two defendants, Mrs. Andrews, Mr. Breaux and Mr. Steward, and the Court is impressed with the testimony of Mr. Breaux and the impartial nature in which he rendered it. And also the testimony of Dr. Ross.

The Court finds, as a matter of fact, that Dr. Ross in his examination of the lady and the therapy, while the Court believes it to be excessive for the time that he was treating the lady for the injury that was involved, and the physical contact of the two automobiles or the automobile and the truck seems to be rather slight insofar as the point of impact on the truck being the rear wheel, the right rear wheel of the truck, the Court feels that the injuries to Mrs. Andrews in accordance with the testimony of Dr. Ross, she was discharged July 14, 1981, for the medical bill one thousand sixty dollars and one hundred nineteen dollars that was given for the x-rays to Dr. Meyers, so that's eleven hundred seventy-nine dollars in medical, and the Court does not give any medical to Dr. Ross for that period of August the 3rd until what is considered the second discharge date. In fact, it seems that thirty-seven (sic) times within this period of time for therapy seems to be rather excessive, even though the Court did allow the full amount of money involved, one thousand sixty dollars, the Court believes that both parties were at fault. That Mr. Breaux was attempting to pull the truck to park, and it's quite obvious on the part of the testimony of Mrs. Andrews and Mr. Steward that neither was paying any attention, and the court does feel he was in the process of *1198 moving out and that the truck continued on even though he saw that the party was about to move out, as was the testimony of Mr. Breaux. He feels on comparative negligence they were both negligent in the amount of fifty per cent each, so the medical bills for Dr. Ross and Dr. Meyers will be eleven hundred seventy-nine dollars, and the Court awards the passenger Mrs. Andrews, Sylvia Andrews, four thousand dollars for pain and suffering. So, that's eleven hundred seventy-nine dollars for medical and four thousand for pain and suffering. That's a total of fifty-one seventy-nine to be split between Mr. Breaux and his insurers and the Coca Cola Bottling Company and Commercial Union and Mr. Steward." (Tr. p. 117-119) (emphasis added).
Apparently, the trial court deemed this case to be one of "excessive treatment", reasoning that the amount of medical treatment perhaps may not have been justifiable in light of the severity of the injuries. On that basis, the trial judge denied recovery for the second period.
In Hillebrandt v. Holsum Bakeries, 267 So.2d 608, 610 (App.4th, 1972), Judge Redmann, as organ of the court, stated on rehearing:
"In the absence of fault on the part of the patient in accepting the treatment, the fault which causes the patient's predicament is not that of the doctor alone, but that of doctor and tortfeasor. And it is foreseeable to the tortfeasor that the tort may place the victim in the hands of an overcharging or overtreating physician, since such physicians are not so unheard of as to make it unreasonably unlikely that overcharge or overtreatment of a tort victim may occur.
In our opinion the blameless tort victim should not bear the expense of litigating with his doctor and should certainly not bear the risk of having to pay tort-caused charges the tortfeasor escapes, since neither item is attributable to the victim's fault.
A tortfeasor is liable for additional suffering caused his tort victim by inappropriate treatment by the attending physician; Hudgens v. Mayeaux, 143 So.2d 606 (La.App., 1962). See also Thibodaux v. Potomac Ins. Co., 201 So.2d 159 (La. App., 1967); Restatement Torts 2d Section 457. The tortfeasor should similarly be liable to the victim for additional monetary damage caused by excessive treatment, which is also the result of the foreseeable cumulation of fault of tortfeasor and doctor.
As between tortfeasor and doctor, perhaps the tortfeasor should not ultimately be liable, since no one should have to pay a doctor for overtreatment. But as between tortfeasor and victim (not himself at fault in accepting the treatments) the tortfeasor must be liable."
See also: Dequeat v. Dobbins, 334 So.2d 555 (App.4th, 1976); Brown v. Bright, 346 So.2d 281 (App.4th, 1977); Blappert v. Lopez, 357 So.2d 1331 (App.4th, 1978). Accordingly, the trial court committed an error of law in failing to allow the $490.00 medical bills for the second period.
Lastly plaintiff argues that the amount awarded for pain and suffering is so low as to constitute a clear abuse of discretion. While the amount awarded for pain and suffering stands at the lower limits of the trial judge's "much discretion", we cannot say that the amount awarded constitutes a clear abuse of discretion. Reck v. Stevens, 373 So.2d 498 (La., 1979). Accordingly, the judgment below is affirmed on this issue.
For the reasons discussed, the judgment of the district court is amended as follows and, as amended is affirmed:
"IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Sylvia Andrews in the full and true sum of FIVE THOUSAND SIX HUNDRED SIXTY-NINE AND NO/100 ($5,669.00) DOLLARS, together with legal interest thereon from date of judicial demand until paid, and for all costs of these proceedings;
*1199 IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the expert fee of Dr. Nathaniel Ross is set at the sum of ONE HUNDRED FIFTY AND NO/100 ($150.00) DOLLARS:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Commercial Union Insurance Company and James Steward are liable unto plaintiff, Sylvia Andrews for fifty (50%) per cent of the damages and costs as hereinabove set forth, and that Louisiana Coca Cola Bottling Company, Ltd., and W. Breaux are liable unto plaintiff, Sylvia Andrews, for fifty (50%) per cent of the damages and costs as hereinabove set forth."
AMENDED AND AFFIRMED.