657 So.2d 697 (1995)
Mr. Harold SUTTON,
v.
Mr. Jackie H. LAMBERT, Merchants Truck Lines, and Integral Insurance Company.
No. 94 CA 2301.
Court of Appeal of Louisiana, First Circuit.
June 23, 1995.
*699 John Caskey, E.A. Robinson, III, Baton Rouge, for plaintiff-appellant Harold Sutton.
*700 Robert Hoover, Baton Rouge, for defendants-appellees Merchants Truck Lines, Inc. and Integral Ins. Co.
John Dale Powers, Troy Charpentier, Baton Rouge, for defendant-appellee Grady Crawford Constr. Co. and Audubon Indem. Co.
Before WATKINS, FOGG and TANNER[1], JJ.
FOGG, Judge.
In this tort action to recover damages for injuries arising out of a motor vehicle accident, issues concerning the damages awarded by a jury are raised on the appeal.
Harold Sutton (plaintiff) was injured on June 9, 1989, when the car he was driving was rear-ended by a truck driven by Jackie H. Lambert and owned by Merchants Truck Lines, Inc. (Merchants). The plaintiff's vehicle was hit while stopped in the right lane of Plank Road because construction performed by Grady Crawford Construction Company (Grady Crawford) blocked the lane. Seeking to recover damages for his injuries, the plaintiff filed suit against Lambert, Merchants and its insurer, Integral Insurance Company (Integral Insurance), as well as Grady Crawford and its insurer, Audubon Indemnity Company (Audubon).[2]
After trial on the merits, the jury determined that Lambert and Merchants were 66% at fault and Grady Crawford was 34% at fault in causing the plaintiff's injuries. The jury awarded the following damages: physical pain and suffering, past and future, $33,000; mental anguish, past and future, $0; personal injuries, including any disability, $5,000; and medical expenses, past and future, $17,000. The court signed judgment in accordance with the jury verdict, awarding the plaintiff damages totalling $55,000 against Merchants, Integral Insurance, Grady Crawford and Audubon. The plaintiff filed a motion for judgment notwithstanding the verdict (JNOV), a motion for additur, and, in the alternative, a motion for new trial, seeking an increase in the amount of damages awarded. The trial court rendered judgment denying the motions. From these judgments, the plaintiff appealed, and the defendants answered the appeal.
On appeal, the plaintiff contends the trial court erred by not granting his motions for JNOV or additur, or, in the alternative, new trial; the trial court erred in the amount of its awards for physical pain and suffering, personal injuries and medical expenses; the trial court erred in failing to award damages for mental anguish; the trial court erred in refusing to allow a jury interrogatory concerning damages for loss of earning capacity, lost wages and loss of sick and annual leave benefits; and the trial court erred in refusing to allow Dr. G. Randolph Rice and Curtis Charrier to testify regarding the plaintiff's loss of earning capacity, lost wages and loss of annual and sick leave. The defendants answered the appeal, contending that the trial court erred in overruling their peremptory exceptions raising the objections of no right of action and failure to join an indispensable party pertaining to the plaintiff's right to recover medical expenses.
According to testimony at the trial, when involved in the accident, the plaintiff was a deputy with the East Baton Rouge Parish Sheriff's Office (Sheriff's office) and was driving a vehicle belonging to the Sheriff's office. The plaintiff's vehicle was hit once when rear-ended, then it went through a roadside fence and was hit again by the truck. In the impact, the plaintiff's head hit the wire grille directly behind the front seat. The plaintiff testified that he immediately tried to get out of the car, fearing it would blow up; once out of the car, he collapsed. He went to the hospital after the accident, but he was released after several hours.
The plaintiff saw many doctors after the accident, initially complaining of headaches, and later also complaining of pain in the neck and left arm. During that time, he continued to work. He ultimately underwent an anterior cervical discectomy at the C3-4 and C5-6 vertebrae on January 21, 1991, performed by *701 Dr. Stuart Phillips; Dr. Phillips based his decision to operate partly on the results of a thermogram and discogram. According to the plaintiff, the surgery helped him significantly. The plaintiff was off of work for about six months after the surgery and returned to work in August or September, 1991.
The plaintiff testified that after the accident and before the surgery, he had problems turning his head, looking down for long periods and driving, and he had difficulty sleeping due to neck pain. At the time of trial, he still experienced an ache in his neck, and he could not go on long car rides, play basketball, lift over fifty pounds, or engage in physical contact with fighting inmates.
Michelle Sutton, the plaintiff's wife, testified that after the accident and before the surgery, the plaintiff experienced mood swings and was ill-tempered; she stated that he was in constant pain and had difficulty sleeping. She also testified that the plaintiff's injuries prevented him from doing things with his family.
For medical treatment, the plaintiff initially went to Dr. L.J. Messina, an orthopedic surgeon, on June 16, 1989, due to complaints of back and neck pain. Dr. Messina's examination disclosed no abnormal findings and he treated him with pain and anti-inflammatory medications. Dr. Messina's examinations of the plaintiff in July, August, and September were normal; he had the plaintiff undergo a CT-scan in July, 1989, and found no herniated disc. On August 16, 1989, he diagnosed the plaintiff with low back and neck strain, which had resolved with conservative management, and he advised the plaintiff to return to work. On December 5, 1989, the plaintiff returned to Dr. Messina, complaining of neck pain and numbness and tingling in his left arm. On examination, Dr. Messina found atrophy in the left arm, for which a neuropathic change could be responsible, but otherwise, his findings were normal. He ordered a second CT-scan in December, 1989, which revealed no abnormal findings. Dr. Messina testified that the plaintiff had persistent complaints of pain, but he could not substantiate them on his examinations.
Dr. Robert E. Hanchey, a neurosurgeon to whom Dr. Messina referred the plaintiff, saw him two weeks after the accident for his complaints of headaches and neck pain. On examination, Dr. Hanchey found that the plaintiff had a guarded, but good, range of motion, and that he was experiencing tenderness in the upper cervical region and significant headaches. He prescribed an antidepressants and an analgesic. He saw the plaintiff again on January 15, 1990 for his complaints of pain in the neck and left arm. On examination, Dr. Hanchey's findings were normal. The plaintiff returned to Dr. Hanchey in February and August, 1990, with no improvement in his condition. Dr. Hanchey diagnosed the plaintiff with post-concussive syndrome but found no major objective evidence of injury and no explanation for the plaintiff's other problems.
Dr. Neil Smith, a neurologist, began treating the plaintiff on July 5, 1989, for his headaches. On examination, the findings were normal, and Dr. Smith diagnosed post-concussive syndrome with dizziness and prescribed medication. He saw the plaintiff again on July 19, 1989, and increased the medication and recommended physical therapy for the neck; he diagnosed a whiplash injury. On September 26, 1989, the plaintiff complained of tenderness in the right side of the neck, and Dr. Smith prescribed an anti-flammatory. In October, 1989, the headaches were the plaintiff's primary problem, but he was continuing to have problems with his neck.
In November, 1989, the plaintiff began to have pain in his left arm and left shoulder; his headaches abated as of January 29, 1990. On that date, an MRI was performed, which was normal. On February 1, 1990, an EMG was performed which showed neuropathic changes at C5-C6, but no evidence of problems at C3-C4. A myelogram and a post-myelogram CT-scan were performed, and both were normal. Dr. Smith continued to treat the plaintiff conservatively with physical therapy, anti-inflammatories, analgesics and cortisone injections. On June 25, 1990, a second EMG showed neuropathic changes at C5-C6 and C6-C7. Dr. Smith referred the plaintiff to Dr. Dulligan, another neurosurgeon, *702 who recommended traction; however, after traction, the plaintiff returned to Dr. Smith with even more problems. Dr. Smith then prescribed a TENS unit. Another MRI performed on August 6, 1990, was negative. On September 6, 1990, the plaintiff was not any better, and Dr. Smith informed him he could no longer help him. Dr. Smith believed that the plaintiff had sustained a stretching type injury to a nerve root in the accident.
Dr. John R. Clifford, a neurosurgeon, first saw the plaintiff on November 6, 1990, at defense counsel's request. Dr. Clifford's examination of the plaintiff was normal except for mild neck tenderness; he diagnosed a longstanding soft tissue injury to the neck. Dr. Clifford testified that no objective findings supported the existence of a ruptured cervical disc; however, based on the EMG results, he stated that over time the plaintiff had "a better than even chance of turning up with a ruptured cervical disc."
Dr. Randall Lea, an orthopedic surgeon, examined the plaintiff on January 15, 1990, and found tenderness in the neck, a mild to moderate limitation of neck motion and atrophy in the left upper arm. Dr. Lea testified that an MRI which was performed on January 19, 1990, was normal. He did not believe that the plaintiff had a ruptured disc, but rather, that he had a tractional injury caused by the accident. According to Dr. Lea, a tractional injury can take two years to heal. He stated that the plaintiff's permanent physical impairment from the injury was eight to twelve percent.
Dr. Charles Aprill, an expert in radiology engaged in the diagnostic evaluation of adults with spine disorders, performed a CT-scan on August 7, 1990 and noted a small protrusion between C3 and C4, a possible protrusion at C5-C6, and bony spurs at C4-C5 and C5-C6. He performed an MRI on August 13, 1990, and saw no convincing abnormal findings. Dr. Aprill performed a cervical discogram on the plaintiff on November 15, 1990; he determined that the test showed a tear at C3-C4 which he believed was associated with the mid/upper cervical and headache pain, and a tear on the left side at C5-C6 which he thought was associated with the low cervical/left shoulder girdle pain. He concluded that the plaintiff suffered from discogenic pain syndrome. On cross-examination, Dr. Aprill admitted that the discogram is a controversial test.
Dr. Phillips, the orthopedic surgeon who operated on the plaintiff, began treating him on March 29, 1990. Upon examination, he found pain in the neck with acts of compression, that the Spurling's and Adson's signs were positive, that the plaintiff had limited shoulder motion and a loss of range of motion in the neck as well as tenderness and muscle spasm. Dr. Phillips testified that x-rays showed a flattening of the curve in the plaintiff's neck and that his review of the EMG indicated that the plaintiff had nerve irritation; from the EMG, the plaintiff's history and symptoms and his examination, he suspected a ruptured disc at C5-C6. Dr. Phillips had the plaintiff undergo a thermogram, which confirmed nerve fiber irritation at C5, and he reviewed the MRI and CT-scan performed by Dr. Aprill. Dr. Phillips had the plaintiff undergo a discogram which he interpreted to indicate tears in the discs at C3-C4 and C5-C6. According to Dr. Phillips, the plaintiff had undergone an adequate course of conservative care, so he recommended an anterior cervical discectomy. The plaintiff had no problems with the surgery or his recovery from it, and his pain was relieved following the surgery. The plaintiff did not work during his recuperation from the surgery; Dr. Phillips allowed him to return to work on August 1, 1991. Because of the discectomy, Dr. Phillips assessed the plaintiff with a fifty percent loss of function in his neck and a twenty-five percent disability of the whole body.
Drs. Smith, Messina, Hanchey, Lea and Clifford testified that they did not believe surgery was necessary. In particular, Dr. Smith testified that after reviewing the testing performed by other doctors prior to the plaintiff's surgery, he did not believe that surgery was needed or that thermograms or discograms were appropriate to determine whether surgery was needed because their results were falsely positive and, therefore, unreliable. Drs. Clifford, Lea and Hanchey corroborated Dr. Smith's testimony that the *703 discogram and thermogram were not reliable tests to indicate a need for surgery. According to Dr. Smith, three MRIs, two CT-scans and a myelogram with a follow-up CT-scan were all normal; the EMG was the only abnormal study which indicated that the plaintiff could have a disc problem. Dr. Smith testified that if the plaintiff were better after the surgery, the improvement was simply due to the passage of time. According to Dr. Clifford, the plaintiff would obtain no relief once the placebo effect of the surgery passed.
Drs. Messina, Smith, Clifford, and Lea testified that the plaintiff had sustained a soft tissue injury, not a ruptured disc. Dr. Messina testified that if the plaintiff had ruptured a disc from the accident, the CT-scans should have shown it, and that he did not believe the accident caused a disc to rupture. Dr. Clifford did not think that the accident caused a cervical disc injury because the plaintiff did not have a disc problem when examined eighteen months after the accident. Drs. Lea and Hanchey also did not believe that the plaintiff had a ruptured disc.
The defendants introduced into evidence a letter from Dr. Michael P. Dulligan, a neurosurgeon, in which he stated that his examinations of the plaintiff on May 31, 1990, and on August 3, 1990, revealed no abnormal findings, that he saw no surgical condition, and that he would characterize the injury as a flexion-extension soft tissue injury to the neck.
Concerning the effect of the accident on the plaintiff's employment, Captain Eddie C. Henderson, the plaintiff's supervisor, testified that before the accident, the plaintiff supervised prisoners in the recreation crew; after the surgery, when the plaintiff had to take a light duty position, he became chairman of the prison disciplinary board.
Curtis Charrier, the plaintiff's vocational rehabilitation expert, testified that the plaintiff was promoted to sergeant after the accident, while he was the chairman of the disciplinary board. When interviewed by Charrier, the plaintiff told him that he was very pleased with his position as chairman. The plaintiff informed Charrier that he experienced pain in his neck which worsened if he worked a double shift or overextended himself, and that extra duty work increased his pain; however, the plaintiff told Charrier that he still performed extra duty work three to four times per week. The plaintiff informed Charrier that he was forty-eight hours short of a degree from Southern University. Charrier testified that generally, the work of a correctional officer requires lifting of up to fifty pounds and that in such employment, the plaintiff is exposed to the possibility of inmates fighting. Charrier would recommend that the plaintiff stay in his position as chairman of the disciplinary board, and admitted that the possibility of the plaintiff's actually being laid off was not likely due to the plaintiff's seniority; the plaintiff had been employed with the Sheriff's office for thirteen years.
The plaintiff testified concerning extra duty work. According to the plaintiff, before the accident, he sometimes worked extra duty of thirty to thirty-six hours per week at $10 per hour; after 1992, he earned $12 per hour. However, the plaintiff did not report the extra duty income on his income tax and, therefore, could not document his extra duty earnings. The plaintiff stated that he could not work extra duty from the date of the accident through December, 1991. The plaintiff testified that he asked for extra duty after the accident, but that he was not allowed to work certain details, such as one at Earl K. Long Hospital.
Captain Michael Fourrier, another captain with the Sheriff's office, testified that because the plaintiff could only do light duty, there were fewer extra detail positions available to him. However, he also testified that after the accident, the plaintiff worked on a light duty extra detail of over sixty-one hours at the balloon festival, and, in 1991, the plaintiff worked forty-two hours at the state fair.
Deputy Peggy T. Pourciau, the payroll and general operations coordinator for the Sheriff's office, testified that the plaintiff did not lose any sick or annual leave due to work missed because of the accident, nor did he lose any wages. Pourciau explained that the Sheriff's policy was that any deputy injured on duty received his regular salary.
*704 Initially, the plaintiff contends that the trial court erred in denying his motion for JNOV. A motion for JNOV should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In determining whether to grant the motion, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. On appeal of the denial of a motion for JNOV, this court determines if the trial court erred by using the criteria for a JNOV: if reasonable persons in the exercise of impartial judgment could differ as to the fact that items of damages awarded were abusively low, the motion for JNOV was properly denied. See Anderson v. New Orleans Public Service, 583 So.2d 829 (La.1991).
We find that the trial court erred in denying the plaintiff's motion for JNOV as to the jury's failure to award any damages for mental anguish.[3] The jury clearly believed the plaintiff was injured in the accident as evidenced by its other awards. Attendant to the physical injury was the mental pain and suffering of the plaintiff while experiencing eight months of severe headaches, and eighteen months to two years of neck and arm pain, and emotional trauma from the accident itself, including the plaintiff's fear that he had to exit his car immediately because he thought it might explode. Both the plaintiff and his wife testified as to the effect of the injuries on his personality. Therefore, we believe that reasonable persons could not conclude that the plaintiff was not entitled to any damages for mental anguish, and find that the trial court erred in denying the motion for JNOV as to this item of damages. Considering the evidence of record, an award of $7,500.00 for mental anguish is appropriate, and we will amend the judgment accordingly.
We find that the JNOV was properly denied as to the other items of damages awarded by the jury. Based on the evidence, reasonable minds could conclude that the plaintiff did not sustain a disc injury requiring surgery due to the accident and therefore, that the surgery was unnecessary. The jury's award of medical expenses supports such a conclusion as the jury awarded the plaintiff all of his medical expenses except those associated with the surgery. Thus, based upon the evidence, reasonable minds could conclude that the defendants were not responsible for any general damages associated with the surgery. We will not consider the plaintiff's entitlement to a JNOV as to medical expenses for reasons which we will discuss in conjunction with the defendants' contentions regarding medical expenses raised in their answer to the appeal.
The plaintiff contends that the trial court should have granted his motion for new trial because the jury verdict represented a miscarriage of justice. The trial judge is granted wide discretion in allowing or denying the motion for new trial, and in reviewing the grant or denial of a motion for new trial, we are bound to affirm the trial court's decision absent clear error in the findings of fact or an abuse of discretion in the assessment of the award. Williams v. Exxon Corp., 541 So.2d 910 (La.App. 1st Cir.), writ denied, 542 So.2d 1379 (La.1989). Our review of the testimony and evidence concerning the plaintiff's *705 damages (other than those awarded for mental anguish) does not show that the damages the jury awarded represent a miscarriage of justice. This contention has no merit.
Our determination that the JNOV was properly denied as to all items of damages other than mental anguish does not dispose of the plaintiff's contention that the jury's damages awards were an abuse of its discretion. The determination by the trial court that the evidence is minimally sufficient to withstand a JNOV does not foreclose a finding by this court, upon appellate review, of an abuse of discretion. Higley v. Kramer, 581 So.2d 273 (La.App. 1st Cir.), writ denied, 583 So.2d 483 (La.1991). The role of this court in reviewing a general damages award is not to decide what we consider to be an appropriate award, but to review the exercise of discretion by the trier of fact. We must first determine whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. The discretion vested in the trier of fact is great and vast, so that an appellate court should rarely disturb an award of general damages. Only when the award is beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances should this court increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994)
We have thoroughly reviewed the testimony and evidence and cannot conclude that the jury abused its discretion in the damages awarded for physical pain and suffering and personal injury, including any disability. As stated earlier, the jury did not believe that the plaintiff's surgery was necessary, and thus, did not award damages associated with the discectomy. The amount of the jury's award for the plaintiff's arm and neck pain for a period from eighteen months to two years and severe headaches for eight months was not an abuse of discretion. The plaintiff's contention has no merit.
The plaintiff contends that the trial court erred in not allowing the jury to hear the testimony of the plaintiff's vocational rehabilitation expert, Curtis Charrier, and his economic expert, Dr. G. Randolph Rice. However, the trial court allowed the plaintiff to read the deposition testimony of Charrier to the jury, over defense counsel's objection. Dr. Rice was to testify as to the difference between the plaintiff's future earnings working in his job at the Sheriff's office and his earnings if he were paid minimum wage. The trial court excluded the testimony because it was "pure speculation" and based on facts not in evidence. As the trial court stated, the plaintiff was physically fit and he had been promoted to a better job than he had before the accident. Additionally, Sheriff Elmer P. Litchfield testified that he would retain the plaintiff as an employee as long as he could do his job and gave him no cause to terminate him. Therefore, no evidence showed that the accident would relegate the plaintiff to a minimum wage position and thus, we find no error in the trial court's exclusion of Dr. Rice's testimony. See Combs v. Hartford Insurance Co., 544 So.2d 583 (La.App. 1st Cir.), writ denied, 550 So.2d 630 (La.1989).
The plaintiff also contends that the trial court erred in refusing to allow a jury interrogatory concerning damages for lost wages and loss of sick and annual leave. Because the plaintiff failed to object at the trial to the court's omission of an interrogatory for loss of sick and annual leave, he cannot now raise the issue on appeal. See LSA-C.C.P. art. 1812 B. As to an interrogatory for lost wages, the plaintiff claims that such an interrogatory should have been included because he lost earnings from extra duty details after the accident when he went on light duty status and could only accept certain details. However, the plaintiff did not prove extra duty work was available that he was unable to perform; furthermore, the plaintiff was still able to do some extra duty *706 work. The plaintiff also did not introduce evidence supporting his testimony regarding his earnings from extra duty work before the accident. Therefore, the trial court did not err in refusing to allow a jury interrogatory concerning damages for lost wages and loss of sick and annual leave.
Regarding loss of earning capacity, the trial court instructed the jury that it must determine whether the plaintiff sustained any loss of earning capacity, and that this category of damages would be considered as part of the permanent disability sustained by the plaintiff. The trial court explained that what the plaintiff earned before and after the injury was not the appropriate measure for loss of earning capacity, but that the damages should be based on the plaintiff's ability to earn; the trial court informed the jury that factors it could consider were the plaintiff's age, education and present employment as compared to work prior to the accident. The record shows that counsel for the plaintiff was fully aware that the issue of the plaintiff's loss of earning capacity would be considered by the jury and that the jury was to be instructed that any damages for loss of earning capacity should be awarded under the category of personal injuries, including any disability. Furthermore, the jury awarded the plaintiff $5,000 for this item of damages, an award which was not an abuse of its discretion as discussed earlier; thus, the plaintiff was not prejudiced by the absence of a separate jury interrogatory, and, therefore, the plaintiff's contention is meritless.
We will now discuss the plaintiff's contention that the jury erred in failing to award him his total medical expenses, including those for the surgery, which amount to $37,184.92. The plaintiff alleges that the jury ignored the trial court's instruction regarding the collateral source rule. According to the collateral source rule, a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be diminished, because of benefits received by the plaintiff from sources independent of the tortfeasor's procuration or contribution. Williamson v. St. Francis Medical Center, Inc., 559 So.2d 929 (La.App.2d Cir.1990). Because he was injured while on duty, the plaintiff's medical expenses were paid by Blue Cross, the insurer for the Sheriff's office, and any remaining uninsured expenses were paid by the Sheriff's office. However, the jury award does not indicate that it ignored the collateral source rule, but that it failed to award any medical expenses for the surgery because it found it was unnecessary. This constitutes error because a tortfeasor is liable for unnecessary treatment or overtreatment unless the tortfeasor can show that the plaintiff underwent the treatment in bad faith. Andrews v. Louisiana Coca-Cola Bottling Co, Ltd., 454 So.2d 1193 (La.App. 4th Cir.) writ denied, 459 So.2d 544 (La.1984). See Labee v. Louisiana Coca Cola Bottling Co., Ltd., 500 So.2d 850 (La.App. 1st Cir.1986). The evidence did not show that the plaintiff was in bad faith in incurring the expenses for the surgery and, therefore, even if the jury did determine that the surgery was unnecessary, it erred in failing to find the defendants liable for the full amount of the plaintiff's medical expenses proven at trial. However, for the reasons which follow concerning the defendants' answer to the appeal, the plaintiff is not entitled to an award of his total medical expenses, but only those paid by the Sheriff's office.
In their answer to the appeal, the defendants contend that the trial court erred in overruling their peremptory exceptions raising the objections of no right of action and failure to join an indispensable party pertaining to the plaintiff's right to recover medical expenses. At the trial, the defendants raised peremptory exceptions of no right of action and failure to join an indispensable party, which the trial court denied based on the collateral source rule. However, the defendants did not seek to be exonerated from liability to the plaintiff based on the plaintiff's receipt of a collateral source of compensation which extinguished their liability; the defendants contended that, due to subrogation, the subrogees, and not the plaintiff, are the proper parties to assert the defendants' obligation to pay medical expenses. Jones v. Gentilly Dodge, Inc., 397 So.2d 849 (La.App. 4th Cir.1981). The collateral source rule is inapplicable where the *707 right of subrogation is involved, even if the party subrogated does not appear to assert its subrogation rights and the defendants do not timely object to the nonjoinder of the necessary party. See Guillory v. Terra International, Inc., 613 So.2d 1084 (La.App.3d Cir.), writ denied, 619 So.2d 1063 (La.1993). Where subrogation is proven, the plaintiff may recover only his remaining interest in the partially subrogated claim. Southern Farm Bureau Casualty insurance Co. v. Sonnier, 406 So.2d 178 (La.1981); see also LSA-C.C.P. art. 697.
LSA-R.S. 33:1448 F states,
Sheriffs and their insurers shall be subrogated to all rights and actions which any deputy or his dependents have or may have for all sums which such sheriffs or insurers have paid or may pay as salary or compensation; as health, medical, surgical, hospital, dental, accident, or death insurance benefits; and as such interest is asserted by suit or intervention for a reasonable attorneys' fee therefor.
Thus, subrogation takes place by operation of law in this case and is a legal subrogation. See Nicholes v. St. Helena Parish Police Jury, 604 So.2d 1023 (La.App. 1st Cir.), writ denied, 605 So.2d 1378 (La.1992); see also Orgeron v. Prescott, 93-926 (La.App. 5th Cir. 4/14/94), 636 So.2d 1033, writ denied, 94-1895 (La. 10/28/94), 644 So.2d 654. According to a provision in the plaintiff's insurance contract with Blue Cross, which was introduced into evidence, the plaintiff also conventionally subrogated Blue Cross to his rights against the defendants.
A subrogation right can be assigned to the insured, who then has a right of action to enforce it; moreover, the assignment may be made orally and may be proven like any other fact. Chappetta v. Bowman Transportation, Inc., 415 So.2d 1019 (La. App. 4th Cir.1982); Rond v. Sims, 355 So.2d 591 (La.App. 4th Cir.), writ denied, 357 So.2d 1164 (La.1978). The ultimate debtor cannot question the validity of an assignment of a debt unless he can show prejudice. Keith v. Comco Insurance Co., 574 So.2d 1270 (La. App. 2d Cir.), writ denied, 577 So.2d 16 (La.1991); Bonner v. Beaird, 43 La.Ann. 1036, 10 So. 373 (1891). As to the medical expenses paid by the Sheriff's office, the plaintiff introduced into evidence a document executed by him entitled "REIMBURSEMENT AGREEMENT" in which he authorized his attorney to reimburse the Sheriff for the medical expenses it had paid from any recovery obtained from the tortfeasors, and before any payment was made to him. The plaintiff's attorney also signed the agreement, stating that he would comply with the plaintiff's directions. The plaintiff testified that he was to reimburse the Sheriff's office. This was substantiated by the testimony of Suzanne Peay, a Sheriff's office employee who handled insurance for accidents on duty and the plaintiff's medical bills. Therefore, the plaintiff had the right to recover the medical expenses which the Sheriff's office paid because the Sheriff's office assigned its subrogation right to him. The record does not show that Blue Cross granted the plaintiff authorization to judicially enforce the subrogated claim. Murray v. Sapp, 573 So.2d 495 (La.App. 1st Cir.1990); see also Kidder v. Boudreaux, 93-859 (La.App. 3d Cir. 4/6/94), 636 So.2d 282, writs denied, 94-1150 (10/7/94), 644 So.2d 629, 94-1640 (10/7/94), 644 So.2d 630. While the plaintiff testified that he was to reimburse Blue Cross, no other evidence or testimony corroborated the plaintiff's statement, nor did the statement itself specifically evidence an assignment of any right to the plaintiff. Therefore, the plaintiff had no right of action to pursue a claim for reimbursement of medical expenses which had been paid by Blue Cross.
However, the trial court did not err in denying the exception of no right of action because the Code of Civil Procedure does not provide for a partial peremptory exception raising the objection of no right of action. If a plaintiff has a right of action as to any one of the theories or demands for relief set out in his petition, the exception of no right of action should not be maintained. Clement v. McNabb, 580 So.2d 981 (La.App. 1st Cir. 1991). Although the plaintiff does not have a right of action for the medical expenses paid by Blue Cross, the plaintiff has a right to recover those paid by the Sheriff's office. While the granting of the exception of no *708 right of action would have been procedurally improper, as a matter of law, the plaintiff had no right to recover the medical expenses paid by Blue Cross, and the trial court erred in submitting that item of damages to the jury for consideration. Therefore, we reverse the trial court's award of medical expenses representing the portion paid by Blue Cross, and affirm that part of the award representing the expenses paid by the Sheriff's office. We amend the award to include all the medical expenses paid by the Sheriff's office, including those for the plaintiff's surgery, for the reasons expressed earlier; the total medical expenses paid by the Sheriff's office was $6563.59, and we award the plaintiff that amount of medical expenses. Based on our finding on the exception of no right of action, we pretermit the issue concerning nonjoinder of an indispensable party.
For the foregoing reasons, the judgment of the trial court is reversed as to its award to the plaintiff of the medical expenses representing that paid by Blue Cross to the plaintiff; the judgment is amended to award the plaintiff the total medical expenses paid by the Sheriff's office, thus awarding the plaintiff medical expenses of $6563.59. The judgment of the trial court is further amended to award the plaintiff damages for mental anguish of $7,500. In all other respects, the judgment is affirmed. Costs of this appeal are to be paid by the plaintiff.
REVERSED IN PART; AMENDED IN PART; AFFIRMED AS AMENDED.
NOTES
[1] Judge Thomas W. Tanner, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Lambert was named as a defendant, but never served, although he did testify at the trial.
[3] We note that the court instructed the jury that it could consider both physical and mental pain and suffering; the court also charged the jury that "fear or mental anguish while the ordeal of a physical injury is in the [sic] progress is compensable apart from the actual physical injury with attendant pain and suffering sustained by the plaintiff because of an injury." While the verdict form contained blanks for physical pain and suffering, mental anguish, and personal injuries, including any disability, the form did not contain a blank for mental pain and suffering. Given the instruction regarding mental anguish, the jury may have thought it was only to award the plaintiff damages for his fear while the accident was in progress in the space for mental anguish and not to award any damages for mental pain and suffering. However, the plaintiff did not object to the verdict form at the trial court level or here, and the error does not rise to one which would make the verdict infirm. See Higley v. Kramer, 581 So.2d 273 (La.App. 1st Cir.), writ denied, 583 So.2d 483 (La.1991).